T.C. Memo. 2005-102

UNITED STATES TAX COURT

ESTATE OF EDNA KORBY, DECEASED, AUSTIN KORBY, JR., TRUSTEE OF THE
AUSTIN AND EDNA KORBY LIVING TRUST, AND ESTATE OF EDNA KORBY,
DECEASED, TRANSFEROR, AUSTIN KORBY, JR., TRUSTEE OF THE AUSTIN
AND EDNA KORBY LIVING TRUST, TRANSFEREE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18451-02.               Filed May 10, 2005.

<u>David W. Johnson</u> and <u>James A. Beitz</u>, for petitioners.

<u>Helen H. Keuning</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Respondent determined a deficiency of

$1,104,635 in the Federal estate tax of the Estate of Edna Korby

(the estate)[1] and an addition to tax under section 6651(a)(1)[2] of $276,159.  After concessions, the issues for decision are:

(1)  Whether the values of the assets Austin and Edna Korby (Austin and Edna or the Korbys) transferred to the Korby Properties, A Limited Partnership (KPLP), are includable in the gross estate under sections 2036 and 2038.  We hold that 38.26 percent of KPLP's value is includable under section 2036(a)(1);

(2)  whether the value of an annuity purchased in 1995 is includable in the gross estate.  We hold that it is; and

(3)  whether the estate is liable for an addition to tax under section 6651(a)(1) for failure to timely file a return.  We hold that it is.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, second supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference.  At the time the petition was filed, the mailing address for the estate was in

[1]Respondent also determined a deficiency with respect to the estate of Edna Korby's husband, Austin Korby, who died 5 months after Edna.  The issues concerning Austin's estate are addressed in a separate Memorandum Findings of Fact and Opinion of this Court.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the date of the decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Fergus Falls, Minnesota, and Austin Dennis Korby, Jr. (Dennis), Austin and Edna's son and the trustee of the Austin and Edna Korby Living Trust (the living trust), resided in Fergus Falls, Minnesota. Edna died in Minnesota.

I. Background

Austin and Edna were married in 1948. They had four sons: Dennis, Gary Alan Korby, Donald Wayne Korby, and Steven Glen Korby. In 1993, Austin was 79 years old and Edna was 69 years old. In February 1993, Edna was diagnosed with severe Alzheimer's dementia. She resided in Pelican Lake Health Care Center, a nursing home, from mid-February 1993 until she died on July 3, 1998, from progressive dementia. Before 1993, Austin suffered a stroke and was diagnosed with Type II diabetes, hypertension, and cardiac arrhythmias. During 1993, Austin was diagnosed with atrial fibrillation with slow ventricular response. In August 1996, Austin was hospitalized for pneumonia and an episode of congestive heart failure. As a result, he entered a nursing home for several weeks. Austin's health deteriorated after this episode. In the fall of 1998, Austin was hospitalized again for pneumonia and was later transferred to a nursing home, where he lived until his death. On December 2, 1998, Austin died of coronary artery disease, diabetes, and pneumonia.

II.  The Austin & Edna Korby Living Trust

In 1993, Austin and Dennis met with an attorney specializing in estate planning.  On June 2, 1993, with the assistance of the estate attorney, Austin and Edna formed the living trust as cotrustmakers.  Austin and Dennis were the only trustees of the living trust from its inception until Austin's death on December 2, 1998.  Edna was never a trustee of the living trust.  The living trust gave Austin and Edna the authority to control and direct payments from the living trust, add or remove living trust property, and amend or revoke the living trust.

Between 1993 and spring 1995, the following assets of the Korbys were transferred to the living trust:  (1) A money market account; (2) a house in Fergus Falls, Minnesota; (3) a vacant lot in Fergus Falls, Minnesota; (4) a checking account; (5) a savings account; (6) household furnishings and items; (7) a 1-percent general partnership interest in Crane Properties, A Limited Partnership (Crane Properties); (8) a 2-percent general partnership interest in KPLP; and (9) the Korbys' monthly Social Security checks.  During 1993, the living trust also opened a checking account.

III.  KPLP

On March 26, 1994, KPLP was formed under the Minnesota Limited Partnership Act with the help of the estate attorney who had been involved in the formation of the living trust.  Austin,

Edna, and each of their sons signed the KPLP limited partnership agreement (the KPLP agreement) as limited partners on March 26, 1994. The living trust was the sole general partner of KPLP from its formation until 1999. Austin and Dennis signed the KPLP agreement as cotrustees of the living trust. The KPLP agreement provided for management fees to be paid to the general partner "to be measured by the time required to manage and administer the partnership, by the value of property under the general partner(s) administration, and by the responsibilities the general partner(s) assume in discharging of the duties of office." The general partner was to decide the amounts of the management fees. The KPLP agreement also required KPLP to reimburse the general partner for "all reasonable and necessary business expenses incurred in managing and administering the partnership."

KPLP was not funded and did not commence business until spring 1995; therefore, KPLP did not file a tax return for 1994. In 1995, the living trust transferred the money market account with a balance of $37,841 to KPLP. In exchange, the living trust received a 2-percent general partnership interest. Also in 1995, the Korbys transferred the following assets to KPLP: (1) Stocks valued at $1,330,442; (2) State and municipal bonds valued at $449,378; and (3) U.S. savings bonds worth $71,043 (the

transferred assets).[3]  In exchange, Austin and Edna received a 98-percent limited partnership interest.  Austin and Edna then gave 24.5-percent limited partnership interests to irrevocable trusts created for each of their four sons.  Approximately 90 percent of the transferred assets had been held by Austin and Edna in joint tenancy.  The remaining 10 percent had been held by Austin individually or in joint tenancy with his sons.  As a result, Austin contributed 58.46 percent of KPLP's assets, Edna contributed 38.26 percent of KPLP's assets, Austin and Edna's sons contributed 1.28 percent of KPLP's assets, and the living trust contributed 2 percent of KPLP's assets.  After the transfers to the living trust and KPLP, Austin and Edna did not have any bank accounts open in their own names.

For 1995, Austin and Edna filed identical Forms 709, U.S. Gift Tax Return, reporting gifts of 24.5 percent of KPLP's limited partnership interests and 24.75 percent of Crane Properties' limited partnership interests to each of their sons' irrevocable trusts.  The gift tax returns reported the gifts as split gifts; they were given half from each of Austin and Edna. The gift tax returns also applied a 43.61-percent discount to the value of the transferred KPLP interests because the interests were minority interests and lacked management control.  The KPLP

---

[3]In 1994, the Korbys reported income from these assets of $75,429.

interests were valued at $521,870 and the Crane Properties interests were valued at $78,160, for a total gift of $600,030.

After 1995, KPLP maintained five investment accounts at various investment companies and a checking account. Dividends and interest earned on the investment accounts were deposited into the checking account. KPLP's checking account was also used to pay KPLP's expenses. Austin and Dennis were the only signatories on the checking account. In August 1995, Austin purchased an annuity from LifeUSA Insurance Co. for $140,000. Austin named himself as the annuitant and KPLP as the owner on the annuity application. The annuity entitled Austin to payments after the annuity date, September 5, 2005, for a 10-year period as long as he was living. If Austin died during the 10-year period, the payments would continue to his sons as irrevocable beneficiaries. Austin's sons were also entitled to a death benefit if Austin died before the annuity date.

As stated above, the Korbys transferred their house to the living trust in 1995, and Austin lived in the house until 1998. From 1995 through 1998, KPLP and the living trust paid many of the Korbys' household expenses. The living trust made payments to Edna's nursing home, various drug stores, other miscellaneous stores, and the Internal Revenue Service (IRS). The living trust also made occasional cash payments to Austin. To pay all these expenses, the living trust received cash payments from KPLP and

the Korbys' Social Security payments. KPLP paid the utility and heating bills, property taxes, and insurance for the Korbys' residence and paid for subscriptions to newspapers and periodicals. For each year, KPLP deducted as a business expense 40 percent of the home expenses. The deductions were taken because in an IRS audit for an earlier year, it was determined that Austin used 40 percent of his home in his bridge-building business and was entitled to deduct the cost of that portion. KPLP also deducted the cost of Austin's subscriptions to newspapers and periodicals in each year.

The Korbys received Social Security income of $18,014 in 1995, $18,468 in 1996, $19,016 in 1997, and $16,751 in 1998. On its Federal income tax returns and its books and records, KPLP reported its interest and dividend income, value, and payments to the living trust as follows:

| Year | KPLP Income | Payments to Living Trust | KPLP Value |
|------|-------------|--------------------------|------------|
| 1995 | $77,898 | $30,387 | $1,869,901 |
| 1996 | 72,434 | 19,334 | 2,185,581 |
| 1997 | 74,239 | 32,324 | 2,699,138 |
| 1998 | 77,343 | 38,750 | [1]2,625,821 |

[1]Value of KPLP assets on the date of Austin's death.

KPLP reported distributions and guaranteed payments during 1995, 1996, 1997, and 1998 as follows:

| Year | Guaranteed Pymts to GP | Distributions to GP | Distributions to LPs |
|------|------------------------|---------------------|----------------------|
| 1995 | None | $30,387 | None |
| 1996 | $19,334 | None | None |
| 1997 | 32,324 | None | None |
| 1998 | 38,750 | None | $12,061 |

KPLP did not report any guaranteed payments to limited partners in any year. KPLP paid $18,104.76 in 1996 and $4,400 in 1997 for income taxes owed by its limited partners. In 1998, KPLP paid $12,061 for income taxes owed by its limited partners and reported the tax payments as distributions to its limited partners.

For 1995, 1996, 1997, and 1998, the living trust used income from Austin and Edna's Social Security payments and the guaranteed payments from KPLP to pay approximately $2,500 per month to Pelican Lake Health Care Center for Edna's care. Austin and Edna reported medical expenses of $37,684, $38,586, and $40,216 on their 1995, 1996, and 1997 Federal income tax returns, respectively.

In June 1998, KPLP redeemed the U.S. savings bonds that Austin and Edna had contributed in 1995. The U.S. Treasury issued KPLP two checks for $43,638 each. One check was endorsed to the National Western Life Insurance Co. to purchase an annuity. On the annuity application, Dennis was named as the annuitant, and the four Korby sons were named as the four equal owners and beneficiaries. The other check was deposited into the

living trust's checking account. KPLP did not report this amount on its 1998 return as a distribution or a guaranteed payment to the living trust. From these funds, the living trust issued a $10,000 check to each of the Korby sons and retained the remaining $3,638. KPLP reported the interest earned on the U.S. savings bonds as income on its 1998 Federal income tax return.

Austin and Edna's joint Federal income tax return for 1998 was filed by Dennis as personal representative for each estate. The 1998 return was the first return on which it was reported that Austin and Edna were liable for self-employment tax on the payments from KPLP. The living trust remained KPLP's general partner after Austin and Edna died. The living trust held the same property from the spring of 1995 until Austin's death, and the living trust's property was worth $116,097 on the date of Edna's death. Pursuant to the terms of the living trust agreement, Austin and Edna's funeral expenses and Austin's estate taxes were paid by the living trust. On September 1, 1999, KPLP issued a check to the living trust for $19,500. On the same day, the living trust paid estate taxes of $20,068 owed by Austin's estate.

The living trust agreement provided that upon the death of the first of Austin or Edna to die, the living trust would split into a marital deduction trust and a family trust. All of the living trust property, less the amount necessary to use the

unified credit amount in effect for the year of death, was to be transferred to the marital deduction trust. The remaining assets were to be transferred to the family trust.

IV. The Estate Tax Return

The estate mailed Form 706, U.S. Estate (and Generation-Skipping Transfer) Tax Return, on September 1, 1999, and it was received by the IRS on September 5, 1999. The estate tax return listed as jointly owned property the residence, the vacant lot, and a checking account, including half their total value as part of the gross estate. It listed as miscellaneous property half the Korbys' general partnership interests in Crane Properties and KPLP, and personal property. The total gross estate value was listed as $73,398. The estate claimed a deduction for funeral expenses and claimed the marital deduction in an amount approximately equal to the value of the jointly owned property in the gross estate. The estate also reported adjusted taxable gifts of $600,030 for the 1995 gifts of KPLP and Crane Properties interests, gross estate tax of $202,050 subject to the unified credit against estate tax, and zero tax due.

On August 29, 2002, respondent issued a notice of deficiency addressed to the estate and the living trust. On the same day, respondent issued a notice of deficiency to the living trust as transferee of the estate's liabilities (the notices). In the notices, respondent determined that the full values of the assets

held by KPLP were includable in the gross estate under sections 2036 and 2038. Respondent also determined that the value of the property held by the living trust was includable in the gross estate under sections 2036 and 2038, rather than as jointly owned property. Respondent reduced the estate's adjusted taxable gifts from $600,030 to $121,798, reflecting in part respondent's exclusion of the 1995 gifts of KPLP interests.[4] The deficiency in estate tax totaled $1,104,635. Respondent next determined that the estate was liable for an addition to tax under section 6651(a)(1) of $276,159 because the estate tax return was not filed timely.

OPINION

Respondent argues that the value of the property transferred by Austin and Edna to KPLP is includable in Austin's and Edna's gross estates under sections 2036(a)(1) and (2) and/or 2038(a)(1). The estate argues that sections 2036 and 2038 do not apply to the assets the Korbys transferred to KPLP because Austin and Edna retained no right to income from, corpus of, or power of appointment over them, KPLP received the assets in a bona fide sale for adequate and full consideration in money or money's worth, and Austin and Edna did not retain ownership or control

_____

[4]The estate does not challenge respondent's inclusion of the living trust property under secs. 2036 and 2038 or his adjustment to the adjusted taxable gifts. We therefore accept these adjustments.

over the assets alone or in conjunction with anyone else or the power alone or in conjunction with anyone else to alter, amend, revoke, or terminate the enjoyment by any person of the assets. See secs. 2036(a)(1) and (2), 2038(a).

Respondent's determination in the notice of deficiency is entitled to a presumption of correctness. See Rule 142(a). The parties do not address section 7491(a). The estate does not argue that the burden of proof has shifted to respondent under section 7491(a), and it has failed to establish that it has complied with the requirements of section 7491(a)(2). Therefore, we conclude that the estate's burden of proof does not shift to respondent.

The Internal Revenue Code imposes a Federal estate tax on the transfer of the taxable estate of a decedent who is a citizen or resident of the United States. Sec. 2001. The value of the gross estate includes the value of all property to the extent of the decedent's interest therein on the date of death. Sec. 2033.

I. <u>Section 2036</u>

The purpose of section 2036 is to include in a deceased taxpayer's gross estate the value of inter vivos transfers that were testamentary in nature. <u>United States v. Estate of Grace</u>,

395 U.S. 316 (1969). Section 2036(a)[5] generally provides that if a decedent makes an inter vivos transfer of property, other than a bona fide sale for adequate and full consideration in money or money's worth, and retains certain enumerated rights or interests in the property which are not relinquished until death, the full value of the transferred property will be included in the decedent's gross estate. Section 2036(a) is applicable when three conditions are met: (1) The decedent made an inter vivos transfer of property; (2) the decedent retained an interest or right enumerated in section 2036(a)(1) or (2) or (b)[6] in the transferred property which he did not relinquish before his

---

[5]SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--

(1) the possession or enjoyment of, or the right to the income from, the property, or

(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

[6]Sec. 2036(b) provides that the retention of the right to vote shares of a controlled corporation that were transferred by a decedent is the retention of the enjoyment of the transferred property.

death; and (3) the decedent's transfer was not a bona fide sale for adequate and full consideration in money or money's worth. The parties do not dispute that Austin and Edna made an inter vivos transfer of property when they contributed the assets to KPLP. Therefore, we conclude that this requirement is met.

A.   Retention of Rights in Transferred Property

Section 2036 requires the inclusion of the value of transferred property with respect to which a decedent retained, by express or implied agreement, possession, enjoyment, or the right to income. Respondent argues that Austin and Edna retained, by express and implied agreement, until they died, the enjoyment of the assets they transferred to KPLP. The estate argues that Austin and Edna retained no rights with respect to the transferred property and that no agreement, express or implied, existed.

We agree with respondent that an implied agreement existed between Austin, on his own behalf and on behalf of Edna, and the four Korby sons that after the assets were transferred to KPLP, income from the assets would continue to be available to Austin and Edna for as long as they needed income.[7]  In 1995, when Austin and Edna transferred $1,888,704 worth of assets to KPLP,

---

[7]Because we find an implied agreement, we need not decide whether an express agreement existed that gave Austin and Edna the possession of, enjoyment of, or right to income from the transferred assets.

Edna was living in a nursing home and suffering from severe dementia. Edna's nursing home costs were approximately $2,500 per month. Austin had experienced a stroke and had been diagnosed with various ongoing ailments. It is reasonable to believe that Austin and Edna expected to incur significant medical expenses in the future. Austin and Edna reported medical expenses of over $37,000, approximately double their Social Security income, in each of the 4 years before they died. It was clear that the Korbys' Social Security income would not cover their basic expenses in the future. Despite their expected increased expenses, however, Austin and Edna retained in their names or the name of their living trust only their house, a vacant lot, bank accounts with a total balance of $7,428, a 1-percent interest in Crane Properties, a 2-percent interest in KPLP, and the right to receive Social Security income. KPLP paid the Korbys' home expenses after their assets were transferred to it. In order to pay the Korbys' other basic living expenses, KPLP also distributed significant percentages of its income to the living trust, ranging from 26.7 percent of its income in 1996 to 50.1 percent of its income in 1998, which paid their remaining expenses. These payments from KPLP to the living trust totaled at least 52.6 percent of the Korbys' income in each of the 4 years before they died.

The estate argues that the cash payments that KPLP made to the living trust and the payments of the Korbys' home expenses were management fees paid for Austin's services as a money manager for the KPLP assets. The estate further claims that Austin and Edna were financially able to transfer their income-producing assets to KPLP because they expected the living trust to receive management fees that would provide enough income to them. We do not believe that the payments to the living trust were management fees. The purported fees amounted to $19,334 to $38,750 in each of the 4 years before the Korbys died. The amounts were used by the living trust to pay Edna's nursing home costs of over $30,000 per year and the Korbys' taxes, medical expenses, and other various expenses. The amounts were used entirely by Austin and Edna and not by Dennis, who was cotrustee of the general partner and was entitled to half of any management fees. While the living trust received management fees totaling over $120,000 during the years at issue, the limited partners (who owned 98 percent of KPLP) received only one distribution totaling $12,061, for taxes in 1998.

Further, no management contract was executed, and the fees were paid at varying times and amounts, as Austin requested them. The purported fees were not based on any regular or prescribed method of payment or computation. Dennis testified that he caused KPLP to make payments to the living trust whenever Austin

requested them because he was raised not to say no to his father. He stated that he and his father discussed the amounts of the management fees in 1995, and they wrote down the amounts on "pieces of paper" at the kitchen table. These notes regarding the purported fees were not produced by the estate at trial.

The estate submitted an expert report by Paul R. Kenworthy, C.F.P., in which he opined that money managers generally receive fees of 1 to 1.5 percent of the asset values in the portfolios they manage. Mr. Kenworthy testified that fees are generally not determined by the income of the portfolio because income amounts vary with different types of investments.

We accept Mr. Kenworthy's testimony that money managers generally earn 1- to 1.5-percent management fees. However, the record shows that although KPLP held approximately 60 investments, Austin made only 6 sales or purchases between 1995 and 1998. Dennis testified that few trades were made because his parents had low bases in the investments, and KPLP would recognize significant income if they were sold. Given the plan to hold the investments in order to avoid tax, the degree of anticipated management of those assets would have been minimal. The only other management activity the estate claims Austin undertook was reading newspapers and periodicals daily. The living trust continued to receive the purported management fee income and use it to pay the Korbys' expenses even after Dennis

took over most of Austin's duties managing KPLP's assets in February 1997, as reported in the minutes of the partnership. During their lives, Austin and Edna never reported self-employment income from their purported management income; only after their deaths was the income treated as self-employment income, on an income tax return filed by Dennis. While we believe that Austin was skilled at managing his portfolio, the amount of work and time he committed to managing KPLP's assets did not rise to the level that an independent money manager might have committed, and KPLP's assets, under Austin's own plan to avoid recognition of gain, required little management. While the passive nature of transferred assets is generally not determinative in a section 2036 analysis of their transfer to a family limited partnership, we believe the lack of activity by Austin with respect to the KPLP assets is relevant to the issue of whether the payments the living trust received from KPLP were management fees.

All these facts, taken together, show that Austin and Edna had an implied agreement with their sons that Austin and Edna were entitled to the income from the assets they transferred to KPLP. KPLP was formed as a testamentary vehicle designed to transfer Austin's and Edna's assets to their sons during their lives at a significant discount, while retaining for Austin and Edna the economic enjoyment of those assets.

B.    <u>The Bona Fide Sale Exception</u>

Having concluded that Austin and Edna retained the enjoyment of and right to income from the assets they transferred to KPLP, we must now determine whether section 2036 is nonetheless inapplicable as a result of the bona fide sale exception.  We recently held in <u>Estate of Bongard v. Commissioner</u>, 124 T.C. ___, ___ (2005) (slip. op. at 39), that in the context of family limited partnerships, the bona fide sale exception is met where the record establishes the existence of a legitimate and significant nontax reason for the transfer, and the transferors received partnership interests proportionate to the value of the property transferred.  See, e.g., <u>Estate of Thompson v. Commissioner</u>, 382 F.3d 367 (3d Cir. 2004), affg. T.C. Memo. 2002-246; <u>Kimbell v. United States</u>, 371 F.3d 257, 258 (5th Cir. 2004).  The objective evidence must indicate that the nontax reason was a significant factor that motivated the partnership's creation.  See <u>Estate of Harper v. Commissioner</u>, T.C. Memo. 2002-121; <u>Estate of Harrison v. Commissioner</u>, T.C. Memo. 1987-8.  A significant purpose must be an actual motivation, not a theoretical justification.

The facts and circumstances of each case must be examined in order to determine whether the bona fide sale exception has been met.  Certain factors indicate that a bona fide sale has not occurred.  Factors that support a finding that a sale was not

bona fide are: (1) The taxpayer's standing on both sides of the transaction, <u>Estate of Hillgren v. Commissioner</u>, T.C. Memo. 2004-46; (2) the taxpayer's financial dependence on distributions from the partnership, <u>Estate of Thompson v. Commissioner</u>, <u>supra</u>; <u>Estate of Harper v. Commissioner</u>, <u>supra</u>; (3) the partners' commingling of partnership funds with their own, <u>Estate of Thompson v. Commissioner</u>, <u>supra</u>, and (4) the taxpayer's failure to actually transfer the property to the partnership, <u>Estate of Hillgren v. Commissioner</u>, <u>supra</u>.

Austin formed KPLP with the help of his estate lawyer but without the involvement of his sons, who were each to be 24.5-percent owners through trusts and who each signed the KPLP agreement. Austin alone decided which of his and Edna's assets would be contributed to KPLP, the terms of the KPLP agreement, that the living trust would receive management fees as general partner, and whether the limited partners would receive any distributions. In his testimony, Dennis was unfamiliar with the terms of the KPLP agreement. He thought its terms were followed at all times but was unsure how the management fees were to be determined. Gary Korby, one of Dennis's brothers, testified that he was not aware that his father received management fees from KPLP, that he was not represented in the formation of KPLP, and that he did not know how he acquired his interest in KPLP, whether by gift or otherwise. He also testified that although he

signed the KPLP agreement in 1994, the first time his father explained the partnership to him and gave him a chance to ask questions about it was at a partnership meeting in February 1995. Dennis' other two brothers did not testify at trial, but the parties stipulated that their testimony would echo Gary's testimony. These facts indicate that none of Austin's and Edna's four sons was involved in the formation of the partnership or the drafting of the KPLP agreement. Austin essentially stood on all sides of the partnership's formation and approved the provisions of the KPLP agreement without negotiation or input from the limited partners.

The circumstances leading us to conclude above that the payments from KPLP to the living trust were not management fees also weigh against a conclusion that the sale of assets to KPLP was bona fide. The Korbys' use of KPLP income for basic living expenses is inconsistent with a finding of a bona fide transfer. By drafting the KPLP agreement to allow the living trust to determine the amounts of its purported fees as general partner and by making Dennis, with whom Austin had an implied agreement, his cotrustee, Austin ensured that he and Edna would be provided with sufficient income from the KPLP assets during their lifetimes.

The estate argues that the creation of KPLP was bona fide because Austin and Edna created KPLP to protect the family from

commercial and personal injury liability resulting from their bridge-building business, as well as liability arising from divorce. The estate points to provisions in the KPLP agreement that prevented any partner from unilaterally forcing a distribution of partnership property and restricted transfer of the limited partnership interests. However, the estate has not shown that the terms of the KPLP agreement would prevent a creditor of a partner from obtaining that partner's KPLP interest in an involuntary transfer. The limited protection KPLP gave the family and the other evidence in the record lead us to believe that credit protection was not a significant reason for forming KPLP; rather, Austin and Edna formed KPLP in order to make a testamentary transfer of their assets to their sons at a discounted value while still having access to the income from those assets for their lifetime. Instead of retaining assets sufficient to provide the income they would need as their medical expenses grew, Austin and Edna used KPLP in an attempt to insulate all of their income-producing assets from the estate tax. As a result, we find that the transfer of Austin's and Edna's assets to KPLP was not a bona fide sale for full and adequate consideration. Therefore, section 2036(a)(1) applies to the KPLP assets that were contributed by Austin and Edna. Given this conclusion, we need not address respondent's argument for inclusion under sections 2036(a)(2) and 2038.

KPLP's assets were contributed as follows:

| Edna | Austin | Korby sons | Living trust | Total |
|------|--------|------------|--------------|-------|
| 38.26 | 58.46 | 1.28 | 2.00 | 100.00 |

The parties agree that if section 2036 applies to the assets contributed to KPLP by Austin and Edna, 38.26 percent of KPLP's value should be included in Edna's gross estate and 58.46 percent of KPLP's value should be included in Austin's gross estate.[8]  In calculating the values of the KPLP assets at Edna's death, the parties shall take into consideration their stipulation that the value of Amoco stock at Edna's death was $43.039 per share, not $89.13 per share as stated in the notice of deficiency.

II.  The 1995 and 1998 Annuities

The estate argues that respondent incorrectly included the 1995 annuity, valued at $143,000 at Edna's death, in the KPLP assets.  The estate does not object to respondent's valuation of the annuity.  The annuity entitled Austin to payments after the annuity date for a 10-year period as long as he was living.  If Austin died during the 10-year period, the payments would continue to his beneficiaries.  Austin's sons were named as

---

[8]This 38.26-percent portion of KPLP's value is includable in Edna's gross estate in addition to the 2-percent KPLP general partnership interest held by the living trust, which the estate does not dispute is included in Edna's gross estate under sec. 2036(a) as living trust property. In addition, the calculation of the portion includable in each gross estate takes into account that the 1.28-percent interest contributed by the Korby sons is not included in either Austin's or Edna's gross estate.

irrevocable beneficiaries, which also entitled them to a death benefit if Austin died before the annuity date.

The annuity was payable only to Austin if he lived to the annuity date. Edna was not named as an annuitant, beneficiary, or owner on the annuity application. Because she did not possess a right to payments for any period under the annuity, the value of the annuity is not includable in her gross estate under section 2039.

However, the fact that an amount is not includable in a decedent's gross estate under section 2039 does not preclude its inclusion in the gross estate under some other section of the estate tax laws. See Estate of Kleemeier v. Commissioner, 58 T.C. 241, 252 (1972) (citing section 20.2039-1(a), Estate Tax Regs.). The 1995 annuity was purchased by KPLP and was included as one of its assets when Edna died. Its value is therefore includable in Edna's gross estate under section 2036 to the same extent the values of the other KPLP assets are includable. In calculating KPLP's total value, the value of the 1995 annuity, agreed upon by the parties as $143,000 at Edna's death, should be included. The portions includable in Edna's gross estate (the 38.26-percent interest she contributed and the 1-percent general partnership interest owned by the living trust) shall then be calculated from the total value.

The estate also argues that the value of the annuity purchased in 1998 by Austin using the proceeds of KPLP's U.S. savings bonds should not be included in Edna's gross estate. The estate does not argue that the annuity should not be treated as a gift or contest the value respondent ascribed to the annuity ($43,638). The estate's argument is moot; respondent does not argue that it should be included in the gross estate. The estate does not dispute respondent's adjustment of the estate's adjusted taxable gifts by the value of the 1998 annuity.

III. Marital Deduction Under Section 2056

Section 2056 provides for a deduction from the gross estate of a decedent for the value of property that passes from the decedent to the surviving spouse. The estate conceded that if respondent agrees that the value of only 38.26 percent of KPLP's assets is includable in Edna's gross estate and 58.46 percent is includable in Austin's gross estate, the marital deduction does not apply to the KPLP assets. The parties have so agreed, and we accept the estate's concession that the marital deduction does not apply to the 38.26-percent portion of KPLP's value includable in Edna's gross estate under section 2036(a)(1).[9] Respondent

---

[9]The estate argues nonetheless that respondent conceded the marital deduction should apply to the KPLP assets in Edna's estate. In an e-mail dated approximately 3 months before trial, respondent's counsel stated: "we will stipulate to the marital deduction issue". The estate essentially claims that respondent should be bound by his statement by equitable estoppel. We

(continued...)

also conceded that the estate is entitled to the marital deduction under section 2056 for the "property the [living] trust owned upon Edna Korby's death."  The living trust held the house, the vacant lot, the checking account, the general partnership interest in Crane Properties, and the general partnership interest in KPLP at Edna's death.  Therefore, the marital deduction applies with respect to this property.  The unified credit for 1998 will then be applied against the tax imposed by section 2001 on the taxable estate.[10]

We note that the estate argues that respondent's position with respect to the marital deduction issue should be treated as a concession of the issue of whether the transfer to KPLP precludes the application of section 2036 to the transferred assets.  Respondent argues that his statement was not a

_____

[9](...continued)
disagree.  Equitable estoppel precludes a party from denying its own representations if they induced another to act to his detriment.  See Wilkins v. Commissioner, 120 T.C. 109, 112 (2003).  At a minimum, a taxpayer must rely to his detriment on the Commissioner's actions in order to bind the Commissioner by equitable estoppel.  See Boulez v. Commissioner, 76 T.C. 209, 215 (1981), affd. 810 F.2d 209 (D.C. Cir. 1987).  The estate did not rely to its detriment on respondent's counsel's communication; on the contrary, because respondent's counsel's statement was not included in the stipulations of fact, the estate presented evidence at trial and argued its position that the marital deduction should apply to the KPLP assets.

[10]It is not necessary for us to address the effect of the provision in the living trust splitting it into two new trusts at the death of the first spouse to die because respondent conceded that the marital deduction applies to the property held by the living trust at Edna's death.

concession. The statement to which the estate refers was made by respondent in his pretrial memorandum filed with the Court. Before the parties agreed that the marital deduction is inapplicable to the KPLP assets included in Edna's gross estate, the estate argued that the application of section 2036 would cause the KPLP assets to pass to Austin at Edna's death (a requirement of section 2056) under the terms of the living trust. In response, respondent stated:

> Under Articles 8 and 9 of the [living] trust the surviving spouse received a right to trust income during life and a general power of appointment. However, the assets that Edna and Austin used to fund the KPLP were never part of the [living] trust, nor was the 98 percent KPLP limited interest the decedents transferred to their sons. Thus, the surviving spouse has no right to the income or the corpus of 98 percent of the property transferred to the KPLP, nor does the surviving spouse have a power of appointment over that property. * * * [Emphasis omitted.]

In the context of respondent's argument that the property held by KPLP did not pass to Austin at Edna's death, respondent's statement is neither a concession that section 2036 does not apply to the KPLP assets nor inconsistent with his position that the value of the KPLP property is includable in Edna's gross estate. We find that respondent has not conceded any issues by reason of the statement in his pretrial memorandum.

IV. Section 6651(a)(1) Addition to Tax

Section 6075(a) requires that all estate tax returns filed pursuant to section 6018(a) be filed within 9 months after the

date of a decedent's death or within a longer period as extended by the Secretary.  Edna died on July 3, 1998, and the estate tax return was filed on September 5, 1999.  The estate did not request an extension to file the return, and none was granted.  Because the value of Edna's gross estate exceeds the applicable exclusion amount under section 2010 in effect for 1998, $625,000, her estate was required to file a return within 9 months of her death.  Sec. 6018(a)(1).  It did not.  The estate does not argue that it had reasonable cause for its failure to file a timely return or that the addition to tax under section 6651(a)(1) is not appropriate.  Therefore, we find that the estate is liable for the addition to tax under section 6651(a)(1) on the estate taxes due.

To reflect the foregoing, and concessions by the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.