T.C. Memo. 2010-21

UNITED STATES TAX COURT

ESTATE OF CHARLENE B. SHURTZ, DECEASED, BONNIE K. CASE, a.k.a.
BONNIE CATHLEEN CASE, EXECUTRIX, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6076-07.                    Filed February 3, 2010.

Harris H. Barnes III, for petitioner.

Gwendolyn C. Walker, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, Judge:  Respondent determined a deficiency in
Federal estate tax of $4,737,934 and an addition to tax pursuant
to section 6651(a)(1) of $1,184,484 against the Estate of
Charlene B. Shurtz (the estate).  The issues for decision are:
(1) Whether the values of assets transferred by Charlene B.
Shurtz (hereinafter referred to as Mrs. Shurtz or decedent) 6

years before her death to her family limited partnership (Doulos L.P.) are included in the value of her gross estate pursuant to section 2036(a) and/or 2035(a); (2) if the values of the assets transferred to Doulos L.P. are includable in the value of decedent's gross estate, then (a) the values of the assets transferred, and (b) whether the values of assets that are included in the value of decedent's gross estate under section 2036(a) qualify for the marital deduction under section 2056(a) as property included in the gross estate, and (3) whether the estate is liable for an addition to tax under section 6651(a)(1).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the date of decedent's death.

## FINDINGS OF FACT

### I. Charlene B. Shurtz

Mrs. Shurtz died testate on January 21, 2002, at the age of 76 in California.  She was survived by her husband, the Reverend Richard Shurtz (Reverend Shurtz), and her two adult children, Bonnie K. Case (Kathy Case), and Richard L. Shurtz (Rick Shurtz).[1]  Kathy Case is the executrix of the estate; she resided in California at all relevant times.

---

[1]Reverend Richard Shurtz died on Sept. 18, 2006.

Decedent was one of three children of Charles A. Barge and Bonnie Inez Barge (the Barges). The Barges and their descendants (the Barge family) owned and managed, first directly and then indirectly through family partnerships, timberland in the State of Mississippi (the Barge timberland).

Mrs. Shurtz grew up in Mississippi with her two siblings, Charles Richard Barge (Richard Barge) and Betty Morris. Theirs was a religious household, and their religious beliefs strongly influenced how they lived. The Barge family felt that the land was given to them by providence, and hence they were stewards of the land and should use its bounty to do God's work.

From 1954 to 1986 Mrs. Shurtz and her family (the Shurtzes) lived outside the United States, performing missionary work in Brazil and Mexico. They returned to the United States when Reverend Shurtz became the pastor of a church in Montebello, California.

Although Mrs. Shurtz was wealthy (her wealth coming from gifts and inheritance from her parents), the Shurtzes lived modestly. By 1996 the Shurtzes' net worth was approximately $7 million. In keeping with their philosophy, Mrs. Shurtz and her husband used their wealth to contribute to a broad range of charities, including evangelical missions, humanitarian aid groups, church construction, and groups that assisted orphans.

Between 1989 and 2001, Mrs. Shurtz and Reverend Shurtz donated approximately $972,000 to charity.

In 1986 Mrs. Shurtz developed Parkinson's disease. She was able to manage her condition with medication and her illness did not affect her cognitive abilities. In 1996, when Doulos L.P. was established, see infra pp. 6-7, Mrs. Shurtz's Parkinson's disease was under control. She was able to maintain her home in California, travel to Mississippi every year, and perform missionary work in several African countries.

II.  The Family Business:  C.A. Barge Timberlands L.P.

The Barge family increased through the generations, and more members of the family acquired ownership interests in the Barge timberland. By 1993 at least 14 family members held separate undivided interests in the Barge timberland. Walter Gomel, an attorney, informed the Barge family that having numerous undivided interests in the Barge timberland could create difficulties in the operation and management of the business. At trial, Richard Barge testified that Mr. Gomel told him:

> You're going to have a problem because if you make a timber sale, you've got to have the signatures of all these people, and he said, your business is not going to function the way it's set up. And he suggested a partnership, limited partnership.

Consequently, on June 25, 1993, C.A. Barge Timberlands, L.P. (Timberlands L.P.), was established as the entity to operate the

family timber business. All of the persons and trusts having an interest in the Barge timberland joined Timberlands L.P. At its inception the ownership of Timberlands L.P. was:

| General Partner | Capital Account | Ownership Percentage |
| --- | --- | --- |
| Barge Timberlands Management, Inc. (BTM) | $127,623 | 2 percent |

| Limited Partners | Capital Account | Ownership Percentage |
| --- | --- | --- |
| Bonnie Inez Barge | $26,717 | 25 percent |
| Richard Barge | 1,492,207 | 16 percent |
| Betty Morris | 1,346,115 | 16 percent |
| Mrs. Shurtz | 979,575 | 16 percent |
| Trusts for grandchildren | 2,408,979 | 25 percent |

BTM was incorporated to be the general partner of Timberlands L.P. BTM's sole asset was a 2-percent general partnership interest in Timberlands L.P. The shareholders of BTM were Mrs. Shurtz, Richard Barge, and Betty Morris. Mrs. Shurtz owned one-third of BTM's stock at the time of her death; Richard Barge and Betty Morris each owned a one-third interest as well.

On the date of Mrs. Shurtz's death, Timberlands L.P.'s principal asset was 45,197 acres of Mississippi timberland.

The partnership agreement of Timberlands L.P. required the partnership to distribute not less than 40 percent of its net income to its partners each year. The reason for this requirement was to enable the partners to have funds to pay taxes on their distributive shares of Timberlands L.P.'s profits.

III.  The Shurtz Family Limited Partnership--Doulos L.P.

Not long after the establishment of Timberlands L.P., Mrs. Shurtz, Richard Barge, Betty Morris, and their respective spouses approached James Dossett, an experienced tax attorney, and one of his partners, Leonard Martin, to obtain tax and business advice. They had several concerns, the first of which was the protection of the family's interest in the Barge timberland. Specifically, because of the "jackpot justice" that the Barge family members and their spouses believed existed in Mississippi, they were concerned that were they to be sued and a judgment entered against them, they could lose control of the family business. To avoid this problem, Mr. Dossett recommended that each family hold its Timberlands L.P. interest in a limited partnership. Mr. Dossett informed them that if they followed this recommendation, the family timber business could be protected since a judgment creditor would not be able to seize the underlying timberland, but rather would have only a right to distributions made by Timberlands L.P. to its partners.

Mrs. Shurtz wanted to give her children and grandchildren interests in the 748.2 acres of timberland that she had acquired from her parents. On the basis of her experience with Timberlands L.P., Mrs. Shurtz had concerns with respect to the creation of a large number of undivided interests in the timberland. Further, Mrs. Shurtz and Reverend Shurtz wanted to

minimize (or if possible eliminate) estate taxes with respect to the value of these assets upon Mrs. Shurtz's death.  Mr. Dossett informed Mrs. Shurtz that using a family limited partnership would also mitigate these concerns.

Thus, to alleviate the Shurtzes' concerns, Mrs. and Reverend Shurtz formed Doulos L.P. on November 15, 1996.[2]  A project planning note drafted by Reverend Shurtz on June 3, 1997, stated that the purpose of the project was to build Doulos L.P. into a functioning limited partnership in order to:

1. Reduce the estate;

2. provide asset protection;

3. provide for heirs;

4. provide for the Lord's work.

The Doulos L.P. partnership agreement contained language to restrict an outsider from acquiring an interest in the partnership.  To this end, section 11.5, Substituted Limited Partner, of the partnership agreement provides:

> No transferee of the whole or any portion of a Partnership interest owned as a Limited Partner who is not already a Partner in the Partnership shall have to right to become a substituted Limited Partner in place of the assignor unless:
>
> *      *      *      *      *
>
> (b) the written consent of the General Partners to such substitution shall be obtained which consent may be given or

---

[2]Richard Barge and Betty Morris and their families similarly formed family limited partnerships.

withheld in the sole and absolute discretion of the General Partners; * * * [3]

Section 11.6, Further Restrictions on Transfers, of the partnership agreement provides that if any member of Mrs. and Reverend Shurtz's immediate family marries and that family member dies or divorces, then the surviving or divorced spouse of the immediate family member "shall offer to sell all partnership interest owned by such surviving or divorced spouse" back to the Shurtz family.  Section 11.6(b) further provides that if there is a transfer of any partnership interest in any voluntary or involuntary manner under judicial order, legal process, execution, attachment, or other legal action, the person who acquired the interest shall offer to sell the interest to the Shurtz family.

Because the 748.2 acres of timberland were owned only by Mrs. Shurtz, in order to create a partnership (i.e., Doulos L.P.) to hold the property it was necessary for her to transfer an interest in the 748.2 acres to another person.  Consequently, on December 16, 1996, Mrs. Shurtz transferred a 6.6-percent interest in the 748.2 acres to Reverend Shurtz.[4]  On December 17, 1996,

---

[3]Sec. 11.8 of the partnership agreement provides that if a general partner's partnership interest is seized by a creditor it will be automatically converted to a limited partnership interest.

[4]A valuation study conducted by Leonard Martin determined that the contribution of an undivided 6.6-percent interest in the
(continued...)

Reverend Shurtz contributed his 6.6-percent interest in the 748.2 acres to Doulos L.P. for a 1-percent general partnership interest. Also, on December 17, 1996, Mrs. Shurtz contributed her then-undivided 93.4-percent interest in the 748.2 acres, as well as her 16-percent limited partnership interest in Timberlands L.P., to Doulos L.P. for a 1-percent general partnership interest and a 98-percent limited partnership interest.

Mrs. and Reverend Shurtz used the services of Gordon Romberger, a certified public accountant, beginning in 1988 or 1989. Mr. Romberger prepared Mrs. and Reverend Shurtz's Federal and State tax returns at all times thereafter. Mr. Romberger drafted a schedule, apparently for purposes of trial, that was based on Mrs. and Reverend Shurtz's personal income tax returns and reflected Mrs. and Reverend Shurtz's Federal and Mississippi incomes as reported on their tax returns from 1996 through 2002. Mrs. and Reverend Shurtz's Mississippi income (averaging $766,629 per year) was generated from their interests in Doulos L.P. and from a Mississippi bank account. Mrs. and Reverend Shurtz had non-Mississippi income that averaged $81,349 per year.[5]

---

[4](...continued)
748.2 acres was equivalent to a 1-percent general partnership interest.

[5]Respondent drafted a schedule designed to show Mrs. Shurtz's income and expenses after removing Doulos-L.P.-related

(continued...)

Between 1996 and 2000 Mrs. Shurtz made a total of 26 gifts of .4-percent limited partnership interests in Doulos L.P. to her children and to trusts for her grandchildren.[6] Each of these gifts was valued at $19,700 or less. At the time Mrs. Shurtz died in 2002, Mrs. Shurtz and Reverend Shurtz each held a 1-percent general partnership interest in Doulos L.P. Mrs. Shurtz also held an 87.6-percent limited partnership interest in Doulos L.P.; the remaining 10.4 percent was divided among limited partnership interests held by Mrs. Shurtz's children and trusts for her grandchildren.

Doulos L.P. maintained a capital account for each partner and issued Schedules K-1 (Form 1065), Partner's Share of Income, Credits, Deductions, etc. Doulos L.P. filed Form 1065, U.S. Return of Partnership Income, each year.

Doulos L.P. did not maintain books of account, as required by section 4.5 of the partnership agreement. Instead, Mr. Romberger created his own "work papers like a trial balance" in creating the partnership's tax returns.

---

[5](...continued)
income items. However, in contrast to Mr. Romberger's schedule, respondent's schedule did not show how and why adjustments were made to Mrs. Shurtz's income. Additionally, while respondent removed Doulos L.P.'s related income items, respondent's schedule included Doulos L.P.'s related expense items.

[6]The .4-percent transfers were designed to use the annual gift tax exemption.

Doulos L.P. was laggard in opening a bank account; it did not establish one until April 11, 1997, nearly 4 months after the partnership was established. The Doulos L.P. bank account was initially a checking account, but on June 17, 1997, it was changed to a money market account. Inasmuch as only a limited number of checks each month could be written from the money market account, Mrs. and Reverend Shurtz paid some of Doulos L.P.'s disbursements from their personal bank accounts. Doulos L.P. reimbursed the Shurtzes for some of these payments. Payments made by Mrs. and Reverend Shurtz that were not reimbursed were credited to their capital accounts.

Distributions from Doulos L.P. to its partners were not always proportional. In 1997 Mrs. Shurtz was the only partner to receive a distribution; in 1999 only Mrs. Shurtz and Reverend Shurtz received distributions; and in 2000 Mrs. Shurtz received a distribution greater than her proportionate share of the partnership's income. However, the partnership made up the missed distributions in subsequent years.

IV. The Management of Doulos L.P. and Timberlands L.P.

The entire Barge family was conscientious about managing the family timber business. The Barge family even had a mission statement. In order that each adult family member could participate in the management of the Barge timberland, and then Timberlands L.P., beginning in the mid-1980s the Barge family

held annual meetings in Mississippi.  Topics discussed at the meetings included the establishment of a saw mill to process the large trees grown on the Barge timberland, land maintenance strategies, and harvesting strategies.[7]  Minutes of these meetings were kept even though under Mississippi law there was no requirement to do so.

Mrs. and Reverend Shurtz regularly attended, and actively participated in, these meetings.  Indeed, it was Barge family policy that everyone be consulted before any major decision was made.

After Mrs. and Reverend Shurtz established Doulos L.P., they combined the Doulos L.P. annual meeting with the annual meeting of Timberlands L.P.  The timberland Doulos L.P. owned was once a part of the Barge timberland.  Doulos L.P.'s timberland required active management similar to that required by the timberland owned by Timberlands L.P.  Specifically, the timberland of both partnerships required planting, reforestation, and general maintenance.

---

[7]There is a substantial amount of work involved in keeping timber healthy.  Roads and culverts must be built and maintained in order to properly support the growth of the timber, the trees must be thinned so that the growing trees do not interfere with each other, pests must be controlled, and, sometimes, trees must be planted because they do not reseed naturally.

V.   <u>Mrs. Shurtz's Estate Planning</u>

In 1998 the Shurtzes decided to review their estate plan. To that end, they approached the Dallas Seminary Foundation, an organization affiliated with the Dallas Theological Seminary (the seminary) that assists individuals in designing estate and charitable gift plans to maximize their charitable bequests.  The seminary referred them to Lewis Wall, an attorney who focuses on estate planning.  Mr. Wall drafted a revocable trust agreement (entitled the Shurtz Family Trust Agreement) to take effect upon the death of either Mrs. Shurtz or Reverend Shurtz.  The Shurtz Family Trust was intended to achieve the following goals:

(1) Assure to the extent possible that there was no Federal tax payable at the death of the first spouse;

(2) minimize Federal estate taxes at the surviving spouse's death through proper use of the available unified credit (exemption) amount, coupled with use of each of the survivor's remaining generation-skipping exemption amounts to the extent possible;

(3) assure that the decedent's interest in Doulos L.P. remained in the family;

(4) provide for the remainder of the estate (upon the death of the survivor spouse) to pass into a charitable lead annuity trust which would provide for a 12-percent-per-year annuity to charity for a term sufficient that the remainder interest to the

family members would be valued at zero or as close to zero as possible.

Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, for the estate was due by April 21, 2003; however it was not filed until December 2003.

Mrs. Shurtz's gross estate was valued at $8,768,059.03. The assets having the greatest values making up the gross estate were:

1. An 87.6-percent limited partnership interest in Doulos L.P. valued at $6,116,670;

2. a 1-percent general partnership interest in Doulos L.P valued at $73,500;[8]

3. 100 shares of BTM valued at $383,700; and

4. one-third of the residue of the Estate of Bonnie Barge valued at $1,126,190.

Mrs. Shurtz's estate plan was designed to minimize or eliminate the payment of estate tax. To achieve this objective, $345,800 went to a unified credit trust and $7,674,143.03 went to trusts qualifying for the marital deduction. Deductible expenses of the estate totaled $93,916. Hence, after giving consideration to the remaining amount of lifetime unified credit available to Mrs. Shurtz, the estate's tax advisers believed that no estate tax was

---

[8]The underlying asset of Doulos L.P. (the 16-percent limited partnership interest in Timberlands L.P.) was valued by the estate at $$9,993,280.

due and therefore they were not overly concerned that Form 706 was not timely filed.

OPINION

A Federal estate tax is imposed "on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States." Sec. 2001(a). The estate tax is imposed on the value of the taxable estate with specified adjustments. Sec. 2001(b). The value of a decedent's taxable estate is the value of the decedent's gross estate less enumerated deductions. Sec. 2051. The value of a gross estate includes the value of all of the decedent's property to the extent provided under sections 2031 through 2046.

I.   Contentions of the Parties

Respondent contends that the values of the assets contributed to Doulos L.P. are includable in the value of Mrs. Shurtz's gross estate by reason of her retention of the control, use, and benefit of the transferred assets within the meaning of sections 2036 and/or 2035(a). On the other hand, respondent contends that for purposes of section 2056(a), the value of Mrs. Shurtz's interest in Doulos L.P. should be used to determine the amount of the marital deduction.

Petitioner posits that Mrs. Shurtz left no taxable estate because her entire estate was left first to a unified credit trust (formed to use the unified (exemption) credit) and then to

various marital trusts.  Further, petitioner contends that section 2036(a) does not apply because Mrs. Shurtz's transfer of assets to Doulos L.P. constituted a "bona fide sale for an adequate and full consideration" within the meaning of that provision.

## II.   Property Included in the Gross Estate Pursuant to Section 2036(a)

We first examine whether the values of assets Mrs. Shurtz transferred to Doulos L.P., i.e., her interest in Timberlands L.P. and the 748.2 acres of timberland, are included in the value of Mrs. Shurtz's gross estate under section 2036(a).  If these asset values are not so includable, there is no estate tax deficiency.

Section 2036(a) is "intended to prevent parties from avoiding the estate tax by means of testamentary substitutes that permit a transferor to retain lifetime enjoyment of purportedly transferred property."  Strangi v. Commissioner, 417 F.3d 468, 476 (5th Cir. 2005), affg. T.C. Memo. 2003-145, petition for rehearing granted on other grounds 429 F.3d 1154 (5th Cir. 2005).  Inter vivos transfers that are testamentary in nature, "i.e., transfers which leave the transferor a significant interest in or control over the property transferred during his lifetime", are included in the value of the gross estate pursuant to section 2036(a).  United States v. Estate of Grace, 395 U.S. 316, 320 (1969).  Section 2036 provides in pertinent part:

SEC. 2036.   TRANSFERS WITH RETAINED LIFE ESTATE.

　　(a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--

　　　　(1) the possession or enjoyment of, or the right to the income from, the property, or

　　　　(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

See also sec. 20.2036-1(a), Estate Tax Regs.

In sum, section 2036(a) is applicable when three conditions are met:  (1) The decedent made an inter vivos transfer of property; (2) the decedent's transfer was not a bona fide sale for adequate and full consideration; and (3) the decedent retained an interest or right enumerated in section 2036(a)(1) or (2) in the transferred property.[9]  See Estate of Bongard v. Commissioner, 124 T.C. 95, 112 (2005).  Courts have emphasized that section 2036(a) "describes a broad scheme of inclusion in the gross estate, not limited by the form of the transaction, but concerned with all inter vivos transfers where outright disposition of the property is delayed until the transferor's

---

[9]Sec. 2036(b), regarding the retention of voting rights with respect to shares of controlled corporations, is not herein applicable.

death." Guynn v. United States, 437 F.2d 1148, 1150 (4th Cir. 1971). Courts apply a higher level of scrutiny to intrafamily transactions. Estate of Bigelow v. Commissioner, 503 F.3d 955, 969 (9th Cir. 2007), affg. T.C. Memo. 2005-65; Kimbell v. United States, 371 F.3d 257, 263 (5th Cir. 2004); Estate of Bongard v. Commissioner, supra at 123.

A.   Whether There Was a Transfer of Property by the Decedent

Petitioner concedes that an inter vivos transfer was made.

B.   Whether the Transfer Was a Bona Fide Sale for an Adequate and Full Consideration in Money or Money's Worth

Section 2036(a) excepts a "bona fide sale for an adequate and full consideration in money or money's worth" from its scope. Section 20.2036-1(a), Estate Tax Regs., refers to the section 20.2043-1, Estate Tax Regs., definition of "a bona fide sale for an adequate and full consideration in money or money's worth". Section 20.2043-1(a), Estate Tax Regs., provides in pertinent part: "To constitute a bona fide sale for an adequate and full consideration in money or money's worth, the transfer must have been made in good faith, and the price must have been an adequate and full equivalent reducible to a money value." The Court of Appeals for the Ninth Circuit, the court to which an appeal of this case lies, has held that "In this context, we consider the 'bona fide sale' and 'adequate and full consideration' elements

as interrelated criteria."  Estate of Bigelow v. Commissioner,

supra at 969.

With respect to the contribution of property to a family

limited partnership, we have stated:

> In the context of family limited partnerships, the bona fide
> sale for adequate and full consideration exception is met
> where the record establishes the existence of a legitimate
> and significant nontax reason for creating the family
> limited partnership, and the transferors received
> partnership interests proportionate to the value of the
> property transferred.  The objective evidence must
> indicate that the nontax reason was a significant
> factor that motivated the partnership's creation.  A
> significant purpose must be an actual motivation, not a
> theoretical justification.

Estate of Bongard v. Commissioner, supra at 118 (citations

omitted); see Estate of Bigelow v. Commissioner, supra at 969;

Estate of Korby v. Commissioner, 471 F.3d 848, 854 (8th Cir.

2006), affg. T.C. Memo. 2005-102 and T.C. Memo. 2005-103.

Further, we have held that "the bona fide sale exception in

section 2036(a) is applicable only where there was an arm's-

length transaction."  Estate of Bongard v. Commissioner, supra at

122.  The Court of Appeals for the Ninth Circuit has

adopted this position.  See Estate of Bigelow v. Commissioner,

supra at 969.

In defining "arm's-length transaction", we have said:

> "The test to determine whether a transaction is a bona fide
> transaction [for Federal income tax purposes] is described
> by the term 'arm's length', or, in other words, Was the
> transaction carried out in the way that the ordinary parties
> to a business transaction would deal with each other?"

Estate of Bongard v. Commissioner, supra at 123 (quoting Dauth v. Commissioner, 42 B.T.A. 1181, 1189 (1940)).

A finding that the transferor sought to save estate taxes does not preclude a finding of a bona fide sale so long as saving estate taxes is not the predominant motive. Accord Estate of Mirowski v. Commissioner, T.C. Memo. 2008-74; see Estate of Schutt v. Commissioner, T.C. Memo. 2005-126 ("Thus, the proffered evidence is insufficient to establish that estate tax savings were decedent's predominant reason for forming Schutt I and II and to contradict the estate's contention that a true and significant motive for decedent's creation of the entities was to perpetuate his buy and hold investment philosophy.").

### 1. Bona Fide Sale

The record shows that decedent had several nontax reasons for establishing Doulos L.P. In 1996, when Mrs. Shurtz was in good health, and with her Parkinson's disease under control, she, her siblings (Richard Barge and Betty Morris), and their respective spouses determined to take action to protect Timberlands L.P. from the litigious environment they believed Mississippi to be.

Mr. Dossett, the attorney who advised the family about establishing their family limited partnerships, credibly testified that he regularly advised his clients about the use of limited partnerships to protect family assets from the risks

imposed by Mississippi's litigious atmosphere.  After their meetings with Mr. Dossett, Mrs. Shurtz and her siblings concurrently established family limited partnerships as part of a coordinated plan.

On the totality of the evidence, we are satisfied that the Barge family (including the Shurtzes) had a legitimate concern about preserving the family business and that they established family limited partnerships to address their concerns.

Preservation of the family business is a legitimate reason for establishing a family limited partnership.  In Kimbell v. United States, supra at 264, the Court of Appeals for the Fifth Circuit examined the bona fide sale exception to section 2036 in the context of a family limited partnership.  Citing its previous holding in Church v. United States, 2000-1 USTC par. 60,369, at 84,778, 85 AFTR 2d 2000-804, at 2000-807 (W.D. Tex. 2000), affd. without published opinion 268 F.3d 1063 (5th Cir. 2001) (per curiam), the court stated that "'[P]reserving the family ranching business for themselves and their descendants' was a valid motivating reason to form the partnership."

We are mindful that the threat to the business must be more than merely speculative.  See Estate of Bigelow v. Commissioner, supra at 972.  As noted supra pp. 20-21, we are satisfied that decedent and her family were actually motivated by a legitimate concern regarding the threat of litigation that went beyond mere

speculation, that the establishment of family limited partnerships was a customary response in Mississippi to possible lawsuits, and that the Doulos L.P. partnership agreement was designed to limit the exposure of the ownership interests of the partnership (e.g., protection of limited partnership interests from seizure and the automatic conversion of general partnership interests to limited partnership interests).

Moreover, the record shows that the establishment of Doulos L.P. facilitated the management of the timberland decedent and her husband contributed to the partnership. The undisputed testimony of Richard Barge demonstrates that having multiple undivided ownership interests impeded the management of the Barge timberland. This problem also existed with respect to the 748.2 acres of timberland directly held by decedent.

We are satisfied that decedent and her husband were aware that the establishment of Timberlands L.P. eased the management of the Barge timberland; hence, we believe it reasonable for them to form Doulos L.P. to hold ownership of their timberland.

Courts have found management efficiency to be a legitimate and significant nontax reason for establishing a family limited partnership in cases where the property required active management. Estate of Bigelow v. Commissioner, 503 F.3d at 972 ("efficient management might count as a credible non-tax business purpose, but only if the business of the FLP required some kind

of active management as in <u>Kimbell</u>"); <u>Kimbell v. United States</u>, 371 F.3d at 268 (property contributed included working oil and gas properties).  In contrast, courts have found that management efficiency is not a legitimate and significant nontax reason for establishing a family limited partnership where the property did not require active management.  <u>Estate of Bigelow v. Commissioner</u>, <u>supra</u> at 972 (property contributed consisted of a house that was rented to a tenant); see <u>Estate of Rosen v. Commissioner</u>, T.C. Memo. 2006-115 (assets contributed consisted primarily of stocks, bonds, and cash, conducted no business activity and had no business purpose for its existence).

We recognize that only a portion of the property contributed to Doulos L.P. required active management.  However, courts have found this to be sufficient.  In <u>Kimbell v. United States</u>, <u>supra</u> at 259, the oil and gas properties contributed amounted to only 11 percent of the total assets contributed to the family limited partnership.  In the instant case, the value of the 748.2 acres contributed to Doulos L.P. (which required active management) was at least 15.8 percent of the total value of the assets contributed to Doulos L.P.[10]  Although decedent did not manage

_____

[10]We determined this percentage by creating a ratio the numerator of which is the stipulated value of the timberland contributed by decedent of $2,496,500, and the denominator of which is respondent's calculation of the value of the Timberlands L.P. interest contributed of $13,310,094 plus the above-mentioned $2,496,500.

the day-to-day operations of the Doulos L.P. timberland, no major decision was made without her approval.

Further, Reverend Shurtz, who also was consulted before any major decision was made, acquired an ownership interest in the timber business.  In Kimbell, the court found that giving the decedent's son, who had managed the business for some time, an ownership interest was a factor in finding that a bona fide sale occurred.  See id. at 268.

Finally, business activities occurred with respect to the timberland.  In this regard, we are mindful that Doulos L.P. annually amortized timber expenses, and in 1997 it realized gain from the sale of timber cut from its land.[11]

In conclusion, although we recognize that reducing estate tax was a motivating factor in establishing Doulos L.P., decedent had valid and significant nontax reasons for establishing the partnership.  These reasons were "actual motivation" and not merely a "theoretical justification."  See Estate of Bongard v. Commissioner, 124 T.C. at 118.  Hence, we find that the transfer of property to Doulos L.P. constituted a bona fide sale.

---

[11]We note that a family limited partnership may still be valid even if it does not conduct an active trade or business. See Estate of Thompson v. Commissioner, 382 F.3d 367, 383 (3d Cir. 2004), affg. T.C. Memo. 2002-246; Estate of Black v. Commissioner, 133 T.C. __, __ (2009) (slip op. at 52); Estate of Bongard v. Commissioner, 124 T.C. 95, 124-125 (2005).

## 2. Full and Adequate Consideration

The record shows that each partner received an interest in Doulos L.P. that represented adequate and full consideration reducible to money value. In Estate of Bongard v. Commissioner, supra at 124, we set out a list of factors by which we determined whether full and adequate consideration was received. Here, all of these factors have been met.

First, the contributors received interests in the family limited partnership proportionate to the ownership interest each contributed. Decedent and her husband engaged an accountant to calculate the value of a 1-percent general partnership interest in Doulos L.P. based on the value of the total property being contributed. Reverend Shurtz contributed property equal to the value of a 1-percent general partnership interest, and Mrs. Shurtz contributed property equal to the value of the remaining 1-percent general partnership interest and the 98-percent limited partnership interest.

Second, the respective assets contributed were properly credited to each partner's respective capital account. Third, distributions from Doulos L.P. required a negative adjustment in the distributee partner's capital account. Fourth, and most importantly we have found the presence of a legitimate and significant nontax business reason for the establishment of Doulos L.P. by Mrs. and Reverend Shurtz.

In sum, we are satisfied on the record before us that the transaction being questioned (i.e., the formation of Doulos L.P. and the contribution of property thereto) was carried out in the way that ordinary parties to a business transaction would do business with each other.  Consequently, we hold that the transfer of property to Doulos L.P. was made for adequate and full consideration.

C.  Whether Decedent Retained an Interest or Right
    Enumerated in Section 2036(a)(1) or (2) in the
    Transferred Property

Because we conclude that a bona fide sale for an adequate and full consideration in money or money's worth occurred, the fair market value of the contributed property is not includable in the value of decedent's gross estate.  Consequently, we need not address whether decedent retained an interest or right enumerated in section 2036(a)(1) or (2) in the transferred property.

In sum, the fair market value of decedent's partnership interest in Doulos L.P., rather than the fair market value of the contributed property, is includable in the value of her gross estate.  See Estate of Black v. Commissioner, 133 T.C. ___, ___ (2009) (slip op. at 54).

III.  Section 2056(a) Marital Deduction

Because we have decided that the fair market value of Mrs. Shurtz's partnership interest in Doulos L.P., and not the fair

market value of the contributed property, is includable in the fair market value of the gross estate, the marital deduction to which the estate is entitled under section 2056 is to be computed according to the value of the partnership interest that actually passed to Reverend Shurtz.  See Estate of Black v. Commissioner, supra at ___ (slip op. at 54).

IV.  Conclusion

Because the values of the assets transferred to Doulos L.P. are not includable in the value of Mrs. Shurtz's gross estate, there is no estate tax deficiency and no tax due from the estate. Consequently, the estate is not liable for an addition to tax pursuant to section 6651(a)(1).

To reflect the foregoing,

Decision will be entered for petitioner.