T.C. Memo. 2009-66

UNITED STATES TAX COURT

ESTATE OF ERMA V. JORGENSEN, DECEASED, JERRY LOU DAVIS,
EXECUTRIX, AND JERRY LOU DAVIS AND GERALD R. JORGENSEN,
CO-TRUSTEES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21936-06.                    Filed March 26, 2009.

John F. Ramsbacher, John W. Prokey, and Dennis I. Leonard, for petitioner.

Matthew A. Mendizabal, Chong S. Hong, and Jeffrey L. Heinkel, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, Judge:  Respondent determined a $796,954 Federal estate tax deficiency against the Estate of Erma V. Jorgensen (the estate).  After concessions the issues for decision are:

(1) Whether the values of the assets Ms. Jorgensen transferred to two family limited partnerships are included in the value of her gross estate under section 2036(a); and (2) whether the estate is entitled to equitable recoupment.[1]

FINDINGS OF FACT

Many of the facts have been stipulated and are so found. The stipulations of facts and the exhibits attached thereto are incorporated herein by this reference. Ms. Jorgensen was a resident of California when she died testate on April 25, 2002, and her will was probated in that State. The estate acts through its executrix, Jerry Lou Davis (Jerry Lou), and through Jerry Lou and Gerald R. Jorgensen, Jr. (Gerald), as cotrustees of Ms. Jorgensen's trust. Jerry Lou, Ms. Jorgensen's daughter, resided in California when the petition was filed. Gerald, Ms. Jorgensen's son, resided in Nebraska when the petition was filed.

Ms. Jorgensen was born in 1914. She earned a college degree from Luther College, after which she worked as a school teacher for about 10 years. During that time she met, fell in love with, and married Gerald Jorgensen, who later became Colonel Jorgensen of the U.S. Air Force. As a young man Colonel Jorgensen put himself through college and law school at the University of

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code (Code), as in effect on the date of Ms. Jorgensen's death. Rule references are to the Tax Court Rules of Practice and Procedure. Amounts are rounded to the nearest dollar.

Nebraska.  At the onset of World War II he joined the Air Force, where he became a highly decorated bomber pilot seeing active combat in both World War II and the Korean War.

After Colonel Jorgensen returned from the Second World War, he and Ms. Jorgensen started a family.  Ms. Jorgensen left her job and became a full-time mother and housewife.  Colonel Jorgensen took over responsibility for the family's financial matters.  When Colonel Jorgensen stopped flying, he joined the Judge Advocate General's office as an attorney.  Later he served with the diplomatic corps of the Air Force in Ethiopia and Yugoslavia.  Colonel Jorgensen's 30-year career in the Air Force entitled him to a pension and provided Ms. Jorgensen with survivor's benefits.  Upon retiring from the Air Force Colonel Jorgensen served as an aide to U.S. Congressman Charles Thone.  This entitled Colonel Jorgensen to a second pension and also provided Ms. Jorgensen with survivor's benefits.

Having come of age during the Great Depression, Colonel and Ms. Jorgensen (sometimes, the Jorgensens) were frugal.  They abhorred debt and saved as much as they could.  Colonel Jorgensen was a knowledgeable investor, and over the years the couple's portfolio of marketable securities grew to over $2 million.  Colonel and Ms. Jorgensen's investments consisted primarily of marketable securities; i.e, stocks and bonds yielding cash dividends and interest.  In 1992 Colonel Jorgensen developed a

relationship with Barton Green, who became the family's investment adviser. Colonel and Ms. Jorgensen adhered to a "buy and hold" strategy premised on long-term growth and dividend reinvestment. Consequently, there was very little trading activity though Colonel Jorgensen regularly researched investments and checked on his holdings. Ms. Jorgensen was not involved in the couple's financial matters or investment decisions. Before the formation of the partnerships at issue the couple's investments in marketable securities were held in four accounts: Two were Colonel Jorgensen's individual accounts, one belonged to Ms. Jorgensen individually,[2] and one was the couple's joint account with right of survivorship.

Ms. Jorgensen's Revocable Trust

Peter Arntson was Colonel and Ms. Jorgensen's estate planning attorney. Mr. Arntson prepared Ms. Jorgensen's revocable trust agreement at the direction of Colonel Jorgensen. Ms. Jorgensen first met Mr. Arntson on October 19, 1994, the day she executed her revocable trust agreement titled "Erma Jorgensen's Trust Agreement". On that same day Ms. Jorgensen executed a durable power of attorney naming Colonel Jorgensen, Jerry Lou, and Gerald her attorneys-in-fact. Ms. Jorgensen later amended her revocable trust agreement in January 1997 to name

---

[2]Although Ms. Jorgensen held one account individually, she was not involved in any decisionmaking with respect to the investments.

Jerry Lou and Gerald as successor trustees in the event of Ms. Jorgensen's inability to manage her affairs. Ms. Jorgensen was the sole beneficiary of her revocable trust during her lifetime. Under the trust terms, she had access to all trust income and corpus without restriction and the trustees had a duty to administer the trust solely for Ms. Jorgensen's benefit.

Formation of Jorgensen Management Association

Colonel Jorgensen, in consultation with Mr. Arntson, decided that he and his wife would form a family limited partnership. Mr. Arntson and Colonel Jorgensen met several times to discuss the structure of the partnership. Neither Ms. Jorgensen nor her children were involved in any of these discussions. On May 15, 1995, Colonel Jorgensen, Ms. Jorgensen, Jerry Lou, and Gerald signed the Jorgensen Management Association (JMA-I) partnership agreement. The JMA-I partnership agreement states that the parties desired to pool certain assets and capital for the purpose of investing in securities. On May 19, 1995, a certificate of limited partnership for JMA-I was filed with the Commonwealth of Virginia.

On June 30, 1995, Colonel and Ms. Jorgensen each contributed marketable securities valued at $227,644 to JMA-I in exchange for 50-percent limited partnership interests. Gerald and Jerry Lou, along with their father, were the general partners. Colonel and Ms. Jorgensen had six grandchildren; three were Gerald's and

three were Jerry Lou's. Gerald, Jerry Lou, and the six grandchildren were listed as limited partners and received their initial interests by gift.[3] Neither Gerald, Jerry Lou, nor any of the grandchildren made a contribution to JMA-I, although each was listed in the partnership agreement as either a general or a limited partner. During his lifetime Colonel Jorgensen made all decisions with respect to JMA-I.

In 1993 Colonel Jorgensen was diagnosed with cancer, and he passed away on November 12, 1996. Before his death he and Ms. Jorgensen moved to California, where they lived in the house next door to Jerry Lou.

On January 29, 1997, Mr. Arntson wrote to Ms. Jorgensen regarding Colonel Jorgensen's estate tax return and her own estate planning. Mr. Arntson recommended that Colonel Jorgensen's estate claim a 35-percent discount on his interest in JMA-I. The estate's interest in JMA-I passed into Colonel Jorgensen's family trust. The family trust was funded with $600,000 of assets including JMA-I interests valued using minority interest and lack of marketability discounts. All amounts over $600,000 went to Ms. Jorgensen. Mr. Arntson also

---

[3]Our use of the term "gift" and other related terms is for convenience only. We do not intend to imply that Colonel and Ms. Jorgensen's transfers of limited partnership interests were completed gifts for Federal tax purposes.

recommended that Ms. Jorgensen transfer her brokerage accounts to JMA-I. He explained:

> Hopefully, this will allow your estate to qualify for the discount available to ownership of interests in limited partnerships and at the same time, facilitate your being able to make annual gifts to your children and grandchildren. This is important if you wish to reduce the amount of your own estate which will be subject to estate taxes.

Mr. Arntson also wrote to Ms. Jorgensen on January 30, 1997. He again recommended that Ms. Jorgensen transfer her and Colonel Jorgensen's estate's brokerage accounts to JMA-I.

> The reason for doing this is so that hopefully your limited partnership interest in JMA partnership will qualify for the 35% discount. Instead of your estate having a value in various securities of about $1,934,213.00 it would be about $1,257,238.00. The difference of $676,975.00 would result in a potential savings in estate taxes to the beneficiaries of your estate of $338,487.50. Obviously, no one can guarantee that the IRS will agree to a discount of 35%, however, even if IRS agreed to only a discount of 15%, the savings to your children would be $145,066.00, and there can be no discount if the securities owned by you continue to be held directly by you.

The Formation of JMA-II

Although Mr. Arntson wrote to Ms. Jorgensen, he did not personally meet with her to discuss additional contributions to JMA-I. Instead, all planning discussions were among Mr. Arntson, Jerry Lou, Jerry Lou's husband, and Gerald. On the basis of these discussions, they decided to form JMA-II. On May 19, 1997, Mr. Arntson wrote to Ms. Jorgensen regarding the formation of JMA-II. He explained:

> To a certain extent we are trying to reorganize your assets and those of Colonel Jorgensen into two different groups--one grouping Jorgensen Management Associates Two (JMA2) will hold basically <u>high</u> basis assets and the second grouping (JMA) will hold basically <u>low</u> basis assets. In the future, you would primarily make gifts to your children and descendants from JMA2 which will hold high basis assets.

JMA-II was formed on July 1, 1997, when Ms. Jorgensen's children filed a certificate of limited partnership interest with the Commonwealth of Virginia. On July 28, 1997, Ms. Jorgensen contributed $1,861,116 in marketable securities to JMA-II in exchange for her initial partnership interest. In August 1997 she contributed $22,019 to JMA-II, consisting of marketable securities, money market funds, and cash. Also in August 1997, in her role as executrix of Colonel Jorgensen's estate, Ms. Jorgensen contributed $718,530 from his brokerage account, consisting of marketable securities, money market funds, and cash. Of the contribution, $190,254 was attributable to Ms. Jorgensen as it was Ms. Jorgensen's marital bequest from Colonel Jorgensen. After these contributions were completed, Ms. Jorgensen held a 79.6947-percent interest in JMA-II, and Colonel Jorgensen's estate held a 20.3053-percent interest. The children and grandchildren did not contribute to JMA-II. But Gerald and Jerry Lou were general partners, and Gerald, Jerry Lou, and the grandchildren were listed as limited partners in JMA-II's partnership agreement.

The children and grandchildren received their interests in JMA-II from Ms. Jorgensen. The values were determined using the values of the securities held by JMA-II on November 12, 1996, although the partnership interests were transferred in the summer of 1997. On the basis of their values in the summer of 1997, the partnership interests exceeded the $10,000 gift tax exclusion. Gift tax returns were therefore required, but none was filed.[4]

Jerry Lou consulted with Attorney Philip Golden about the transfer of limited partnership interests in JMA-II during 1999. Ms. Jorgensen was considering transferring partnership interests valued at $650,000, the estate and gift tax exemption in 1999. In October 1998 Mr. Golden wrote Ms. Jorgensen a letter

---

[4]In 1995, 1996, and 1998 Ms. Jorgensen transferred, respectively, 2-percent, 1.462-percent, and .36522-percent limited partnership interests in JMA-I to each of her two children and six grandchildren. In 1997 and 1998 she transferred, respectively, .4356-percent and .3201-percent limited partnership interests in JMA-II to each of her children and grandchildren.

In 1999 and 2000 Ms. Jorgensen transferred, respectively, 6.5888-percent and 1.5020-percent interests in JMA-II to her children. In 1999 and 2000 she also transferred, respectively, .5905-percent and .6670-percent interests in JMA-II to each of her grandchildren. In 2001 and 2002 she transferred, respectively, .6426-percent and .7352-percent interests in JMA-II to each of her children and grandchildren.

The 1999, 2000, and 2001 transfers of partnership interests were valued using a 50-percent discount. Absent the discount, their values would have exceeded the $10,000 annual gift tax exclusion. The 2002 transfers were valued using a 42-percent discount. Gift tax returns were not filed for the transfers made through 1998 but were filed for 1999 and thereafter.

explaining the concept of using discounts for lack of marketability and minority interests. The letter stated that they needed to hire an expert to value the interests "to have any chance of justifying the discounted value of a limited partnership interest if a gift tax or estate tax return is audited." On October 21, 1998, Mr. Golden requested an appraisal of a 1-percent limited partnership interest in JMA-II. The letter stated that "The partnership's sole activity is to hold and invest securities".

Operation of the Partnerships

Neither JMA-I nor JMA-II operated a business. The partnerships held passive investments only, primarily marketable securities. Jerry Lou maintained the checking accounts for the partnerships, but they went unreconciled, and Gerald never looked at the check registers. Neither of the partnerships maintained formal books or records. Jerry Lou and Gerald received monthly brokerage statements from their broker, and they spoke with their broker approximately every 3 months.

At one point Gerald called Mr. Golden to ask whether there was a way "to access some of this money that's mine." Mr. Golden explained that Gerald could take a loan, but Gerald was surprised that he would have to pay interest. Gerald testified that "it took a while to get my head around the fact that it wasn't just like a bank account you can get money out of." In July 1999

Gerald borrowed $125,000 from JMA-II to purchase a home. On July 25, 2001, Gerald made his first interest payment of $7,625. On August 7, 2002, he made a second and final interest payment of $7,625. Jerry Lou believed that if Gerald did not repay the loan, she would take it out of his partnership interest. However, each of the partnerships required that all distributions be pro rata.

The Mingling of Partnership and Personal Funds

Although the partnership agreements state that withdrawals shall only be made by general partners, Ms. Jorgensen was authorized to write checks on the JMA-II checking account, and she wrote checks on both the JMA-I and JMA-II accounts. In 1998 she signed several checks on the JMA-I account, including cash gifts to family members. On October 26, 1998, Ms. Jorgensen signed checks drawn on JMA-I's checking account, giving gifts of $10,000 to three family members. On April 28, 1999, Ms. Jorgensen deposited $30,000 into the JMA-II account to repay the $30,000 she had withdrawn from the JMA-I account for gift-giving. The record does not indicate why the amount was taken from JMA-I but repaid to JMA-II, nor is there any indication that the error was corrected.

On December 27, 1998, Jerry Lou's husband wrote, and Ms. Jorgensen signed, a $48,500 check drawn on Ms. Jorgensen's personal account to purchase a Cadillac for Gerald. The parties

characterized it as a loan which was forgiven in January 1999. However, the gift was not reported on a gift tax return in 1998 or 1999. On January 10, 1999, Ms. Jorgensen wrote a $48,500 check, drawn on the JMA-I account, to Jerry Lou because Ms. Jorgensen wished to make an equalizing gift but did not have sufficient funds in her personal checking account. The gift to Jerry Lou was not reported on a gift tax return. On April 28, 1999, Ms. Jorgensen deposited $48,500 into the JMA-II account to repay the $48,500 she had withdrawn from the JMA-I account. The record does not indicate why the amount was taken from JMA-I but repaid to JMA-II, nor is there any indication that the error was corrected.

Ms. Jorgensen also used the JMA-I account to pay her 1998 quarterly estimated Federal taxes of $6,900 and her California State taxes of $2,290. The record does not indicate that these amounts were returned to the partnership, although the estate contends that JMA-I's Federal tax return shows the amounts as due from Ms. Jorgensen.[5]

Ms. Jorgensen also paid $6,447 of Colonel Jorgensen's estate's administration expenses using JMA-II's checking account. The record does not indicate that Colonel Jorgensen's estate or

[5]The return reports that $27,833 was due from Ms. Jorgensen. This includes three $10,000 checks written to family members, less partnership expenses paid by Ms. Jorgensen. It is unclear whether the amount due from Ms. Jorgensen includes the amounts paid for taxes.

Ms. Jorgensen repaid the $6,447 to JMA-II. JMA-II also paid Colonel Jorgensen's estate's Federal income tax and legal services related to the filing of his estate's Federal estate tax return. The record does not indicate that these amounts were repaid to JMA-II. JMA-II also paid expenses related to Ms. Jorgensen's 1999 and 2002 gift tax returns. The record does not indicate that these amounts were repaid to JMA-II.

In 1998 and 1999 Ms. Jorgensen paid both partnerships' accounting fees, registered agent's fees, and annual registration fees with the Commonwealth of Virginia. In 1999 she paid attorney's fees to Mr. Golden that related to his conversations with an appraiser regarding the partnerships' structure as well as the preparation of a promissory note related to JMA-II's $125,000 loan to Gerald. Mr. Golden did not issue separate bills for his work with respect to the partnerships and with respect to Ms. Jorgensen.

After Ms. Jorgensen's Death

Ms. Jorgensen died on April 25, 2002. On August 30, 2002, Jerry Lou and her husband sent Gerald a letter informing him of the various issues related to the administration of the estate. The letter stated in part:

> Phil Golden highly recommends that you pay back
> Jorgensen Management II Partnership the $125,000 you
> borrowed. You paid the interest in July for $7,625.00
> so you are just about square. He says it will clean up
> the Partnership and things will look much better should
> we get (and we probably will) audited in the upcoming

months. * * * Guess we have to be real straight on who borrowed what etc. so the partnership looks very legit.

The letter also stated that Gerald had received or was about to receive $286,637, which we presume was related to the settlement of the estate. The $125,000 loan was repaid on January 24, 2003.[6]

Also on January 24, 2003, JMA-II paid Ms. Jorgensen's $179,000 Federal estate tax liability and $32,000 California estate tax liability (as calculated by the estate).

In 2003 through 2006 JMA-I and JMA-II sold certain assets, including stock in Payless Shoesource, Inc., and May Department Stores Co., which Ms. Jorgensen had contributed to the partnerships during her lifetime. In computing the gain on the sale of those assets, the partnerships used Ms. Jorgensen's original cost basis in the assets, as opposed to a step-up in basis equal to the fair market value of the assets on Ms. Jorgensen's date of death under section 1014(a). The JMA-I and JMA-II partners reported the gains on their respective Forms 1040, U.S. Individual Income Tax Return, and paid the income taxes due. Between April 6 and 9, 2008, the JMA-I and JMA-II partners submitted to respondent untimely protective claims for

_____

[6]The $125,000 loan was not reflected as an asset in the valuation of JMA-II and was not reported on Ms. Jorgensen's Federal estate tax return. The estate conceded this was an error.

refund of 2003 income taxes paid on the sale of the assets Ms. Jorgensen contributed to the partnerships.

OPINION

I.   Burden of Proof

Generally the taxpayer bears the burden of proving the Commissioner's determinations are erroneous.  Rule 142(a). However, with respect to a factual issue relevant to the liability of a taxpayer for tax, the burden of proof may shift to the Commissioner if the taxpayer has produced credible evidence relating to the issue, met substantiation requirements, maintained records, and cooperated with the Secretary's reasonable requests for documents, witnesses, and meetings.  Sec. 7491(a).  A showing by the taxpayer that the Commissioner's determinations in the notice of deficiency are arbitrary, excessive, or without foundation also shifts the burden of proof to the Commissioner.  Palmer v. United States, 116 F.3d 1309, 1312 (9th Cir. 1997).

The estate argues that the burden of proof shifts to respondent under both these theories.  Our resolution of the issues is based on the preponderance of the evidence rather than the allocation of the burden of proof; therefore, we need not address the estate's arguments with respect to the burden of proof.  See Blodgett v. Commissioner, 394 F.3d 1030, 1039 (8th Cir. 2005), affg. T.C. Memo. 2003-212; Polack v. Commissioner,

366 F.3d 608, 613 (8th Cir. 2004), affg. T.C. Memo. 2002-145; Knudsen v. Commissioner, 131 T.C. ___ (2008).

II. Section 2036(a)

"'Section 2036(a) is * * * intended to prevent parties from avoiding the estate tax by means of testamentary substitutes that permit a transferor to retain lifetime enjoyment of purportedly transferred property.'" Estate of Bigelow v. Commissioner, 503 F.3d 955, 963 (9th Cir. 2007) (quoting Strangi v. Commissioner, 417 F.3d 468, 476 (5th Cir. 2005), affg. T.C. Memo. 2003-145), affg. T.C. Memo. 2005-65. Section 2036(a) is applicable when three conditions are met: (1) The decedent made an inter vivos transfer of property; (2) the decedent's transfer was not a bona fide sale for adequate and full consideration; and (3) the decedent retained an interest or right enumerated in section 2036(a)(1) or (2) or (b) in the transferred property which the decedent did not relinquish before her death. If these conditions are met, the full value of the transferred property will be included in the value of the decedent's gross estate. Estate of Bongard v. Commissioner, 124 T.C. 95, 112 (2005).

A. Whether There Was a Section 2036(a) Transfer

The estate argues that Ms. Jorgensen's transfers of securities to the partnerships were not "transfers" within the meaning of section 2036(a). The term "transfer" as used in section 2036(a) is broadly defined, reflecting the purpose of

-17-

section 2036(a), which is to include in the value of a decedent's gross estate the values of all property she transferred but retained an interest in during her lifetime.  Estate of Bongard v. Commissioner, supra at 113.  A section 2036(a) transfer includes any inter vivos voluntary act of transferring property. Id.  Ms. Jorgensen's contributions to the partnerships were voluntary inter vivos transfers of property and thus are "transfers" within the meaning of section 2036(a).

B.  Whether the Transfers Were Bona Fide Sales for Adequate and Full Consideration

Section 2036(a) excepts from its application any transfer of property otherwise subject to that section which is a "bona fide sale for an adequate and full consideration in money or money's worth".  The exception is limited to a transfer of property where the transferor "has received benefit in full consideration in a genuine arm's length transaction".  Estate of Goetchius v. Commissioner, 17 T.C. 495, 503 (1951).  The exception is satisfied in the context of a family limited partnership

> where the record establishes the existence of a legitimate and significant nontax reason for creating the family limited partnership, and the transferors received partnership interests proportionate to the value of the property transferred.  The objective evidence must indicate that the nontax reason was a significant factor that motivated the partnership's creation.  A significant purpose must be an actual motivation, not a theoretical justification.
>
> By contrast, the bona fide sale exception is not applicable where the facts fail to establish that the transaction was motivated by a legitimate and

significant nontax purpose.  A list of factors that support such a finding includes the taxpayer standing on both sides of the transaction, the taxpayer's financial dependence on distributions from the partnership, the partners' commingling of partnership funds with their own, and the taxpayer's actual failure to transfer the property to the partnership.

Estate of Bongard v. Commissioner, supra at 118 (citations omitted).

We separate the bona fide sale exception into two prongs: (1) Whether the transaction qualifies as a bona fide sale; and (2) whether the decedent received adequate and full consideration.  Id. at 119, 122-125.

### 1.  Ms. Jorgensens's Nontax Reasons for Forming the Partnerships

Whether a sale is bona fide is a question of motive.  We must determine whether Ms. Jorgensen had a legitimate and significant nontax reason, established by the record, for transferring her property.  The estate argues that Ms. Jorgensen had several nontax reasons for transferring her property to JMA-I and JMA-II.  Respondent disputes the significance and legitimacy of those reasons and offers several factors to support his argument that tax savings were the primary reason Ms. Jorgensen transferred her brokerage accounts to the partnerships.

#### a.  Management Succession

Ms. Jorgensen was not involved in investment decisions during Colonel Jorgensen's lifetime, and she made it known that she did not want the responsibility.  If he predeceased his wife,

as ultimately occurred, Colonel Jorgensen wanted Gerald and Jerry Lou to manage his wife's investments for her.

The estate points to several cases in support of its argument that providing for management succession is a legitimate and significant reason for the transfer of assets to a limited partnership.[7] The U.S. Court of Appeals for the Fifth Circuit has held that transfers to a family partnership were bona fide sales where the purpose was to maintain control and authority to manage working oil and gas interests. Kimbell v. United States, 371 F.3d 257, 267 (5th Cir. 2004). More recently, we held that transfers to a family partnership were bona fide sales where the purposes included requiring the decedent's children to maintain joint management of business matters related to patents and patent licensing agreements, including related litigation. Estate of Mirowski v. Commissioner, T.C. Memo. 2008-74 n.44.

---

[7]The estate also directs us to two additional cases that do not involve transfers to family limited partnerships. In Estate of Bischoff v. Commissioner, 69 T.C. 32, 39-41 (1977), we held that maintaining control of a majority of shares of a pork processing business was a legitimate business purpose for entering into buy-sell agreements at the partnership level, and thus limiting the amount includable in the decedent's gross estate to the amount paid under the agreement. In Estate of Reynolds v. Commissioner, 55 T.C. 172, 194 (1970), we held that a voting trust agreement factored into the valuation of a decedent's estate when the principal purpose of the agreement was to assure the continuity of a life insurance company's management and policies. These cases both involve the management of an active business, not a portfolio of untraded securities, and therefore are distinguishable from this case.

We are mindful that the U.S. Court of Appeals for the Ninth Circuit, to which an appeal in this case would ordinarily lie, has stated that "efficient management" may count as a credible nontax purpose, but only if the business of the family partnership required some kind of active management as in Kimbell v. United States, supra.[8]  Estate of Bigelow v. Commissioner, 503 F.3d at 972; see also Strangi v. Commissioner, 417 F.3d at 481 (transfer of assets had no legitimate nontax rationale where the partnership "never made any investments or conducted any active business following its formation").

In both Kimbell and Estate of Mirowski, the assets transferred to the partnership required active management.  The estate argues that Colonel Jorgensen, and later Gerald and Jerry Lou, engaged in "some kind of active management" with respect to the partnerships.  The estate further argues that because the partnerships invested in specific companies rather than mutual funds, active management was required.  Colonel Jorgensen was a

---

[8]The estate argues that the "efficient management" argument in Estate of Bigelow v. Commissioner, 503 F.3d 955 (9th Cir. 2007), affg. T.C. Memo. 2005-65, is different from its argument with respect to "management succession", and therefore we should disregard Estate of Bigelow on this issue.  We disagree.  The U.S. Court of Appeals for the Ninth Circuit cites Kimbell v. United States, 371 F.3d 257, 267 (5th Cir. 2004), which relates to management of oil and gas interests after the transferor's death.  We therefore conclude that for management succession to be a legitimate nontax purpose under Estate of Bigelow v. Commissioner, supra at 972, there must be at least "some kind of active management".

well-read, self-taught, knowledgeable investor. He researched stocks, tracked his investments, and kept notes and a journal with respect to his investments. Nevertheless, he made very few trades. After his death, Gerald and Jerry Lou were responsible for investment decisions. They were not nearly as knowledgeable or as interested in investing as their father was. They did not research investments or keep records as their father had, and they did not consult with their investment adviser often. Consequently, there was very little trading in the partnerships' accounts.[9]

JMA-I and JMA-II were passive investment vehicles. The general partners' activities with respect to the management of the partnerships did not rise to the level of active management. As the U.S. Court of Appeals for the Third Circuit has suggested, the mere holding of an untraded portfolio of marketable securities weighs against the finding of a nontax benefit for a transfer of that portfolio to a family entity. See Estate of Thompson v. Commissioner, 382 F.3d 367, 380 (3d Cir. 2004), affg. T.C. Memo. 2002-246.

---

[9]In 2005 a new adviser took over their account. The new adviser contacted Jerry Lou approximately every 2 weeks to suggest investment options. However, Jerry Lou indicated that even this limited contact was more than she wanted. She testified that "often I just tell him no, we're happy with things the way they are."

Furthermore, the partnerships were not needed to help Ms. Jorgensen manage her assets because her revocable trust, which had her children as trustees, already served that function. Colonel Jorgensen had a similar plan in the trust he established at the same time as Ms. Jorgensen's. Ms. Jorgensen's trust was authorized to hold substantially all her assets and provided her with centralized management and control. Furthermore, Gerald and Jerry Lou were also her attorneys-in-fact and thus authorized to manage her assets under a durable power of attorney. The estate has not shown how the limited partnerships accomplished the goal of managing Ms. Jorgensen's assets in a way that the trustees of her revocable trust or her attorneys-in-fact could not. See Estate of Bigelow v. Commissioner, supra at 972 (court rejected estate's argument that management of decedent's assets transferred to partnership was a legitimate nontax reason for transfer where general partner was also trustee of decedent's trust); Estate of Erickson v. Commissioner, T.C. Memo. 2007-107 (centralized management of taxpayer's assets was not a legitimate nontax reason for transferring assets to a family partnership, where general partner was also decedent's attorney-in-fact).

In sum, the general partners' management of JMA-I's and JMA-II's portfolios of marketable securities was not active. Therefore, management succession was not a legitimate reason for

Ms. Jorgensen's transferring the bulk of her assets to the partnerships.

### b. Financial Education of Family Members and Promotion of Family Unity

The estate argues that Colonel Jorgensen intended to use JMA-I as a financial education tool to teach his children about investing. The estate also argues that he hoped that the partnership would promote family unity by requiring the children to work together.

The record does not indicate that Colonel Jorgensen actually taught his children much about investing. Although they were general partners in JMA-I, they did not participate in its activities. Colonel Jorgensen made all decisions. In fact, the children testified that after their father died they faced a steep learning curve in operating the partnerships. They further testified that after their father's death they did not make any trades and their investment adviser left them alone.

The estate argues that Colonel Jorgensen hoped JMA-I would promote family unity. However, considering Colonel Jorgensen's failure to involve his children in decisionmaking with respect to JMA-I, we are unconvinced that this was anything more than a theoretical purpose. When JMA-II was formed and funded, JMA-I already ostensibly served to promote family unity. We do not see how JMA-II advanced the goal of family unity. Furthermore, because the partnerships required pro rata distributions, Gerald

and Jerry Lou's differing spending habits (Gerald was a spendthrift; Jerry Lou was frugal), combined with their roles as general partners, seem as likely to cause family disunity as unity.

           c.    <u>Perpetuation of the Jorgensens' Investment Philosophy and Motivating Participation in the Partnerships</u>

The estate argues that the partnerships were formed to perpetuate Colonel Jorgensen's investment philosophy premised on buying and holding individual stocks with an eye toward long-term growth and capital preservation. Gerald testified that he wants the partnerships to operate indefinitely so that his parents' philosophy can be instilled in successive generations.

The estate's argument is unconvincing. Under these circumstances perpetuation of a "buy and hold" strategy for marketable securities is not a legitimate or significant nontax reason for transferring the bulk of one's assets to a partnership.[10] Nor is capital preservation. There are no special skills to be taught when adhering to a "buy and hold"

---

[10]In the unique circumstances of <u>Estate of Schutt v. Commissioner</u>, T.C. Memo. 2005-126, we held that a "buy and hold" strategy with respect to Exxon and Dupont stock was a legitimate and significant motive for transferring assets to two business trusts. The decedent's wife was the daughter of Eugene E. duPont, and the decedent hoped to maintain ownership of the stock traditionally held by the family including stock held by certain trusts created for the benefit of his children and grandchildren in the event those trusts terminated. Similar factors are not present in this case.

strategy, especially when one pays an investment adviser to recommend what to buy and when to sell.  This is not a situation where future generations are taught how to manage an ongoing business.

The estate also argues that transferring interests in the partnerships to their children motivated them to actively participate in the partnerships.  We also find this argument unconvincing.  As previously discussed, Colonel Jorgensen did not include Gerald and Jerry Lou in the decisionmaking process, and the grandchildren received limited partnership interests.  The partnership agreements precluded the limited partners from participating in the decisionmaking process.  The estate recognizes that simplifying gift-giving is not a legitimate and significant nontax purpose.  See Estate of Bigelow v. Commissioner, 503 F.3d at 972.  However, the estate argues that gift-giving was the means to the end; i.e., participation in the partnerships.  We are not persuaded that the transfers of limited partnership interests led to any meaningful participation in the partnerships.  Perhaps the annual receipt of Schedules K-1, Partner's Share of Income, Credits, Deductions, etc., reflecting the income of the partnerships would cause the grandchildren to become interested in investing, but this is merely a theoretical purpose.

### d. Pooling of Assets

The estate argues that the partnerships were created in part to pool assets. JMA-I was funded equally by Colonel and Ms. Jorgensen through their transfer of marketable securities to the partnership. Colonel Jorgensen managed those assets before and after their transfer. Ms. Jorgensen had no involvement in managing the assets or in the decision to transfer them to JMA-I. Under these circumstances the pooling of assets was not a significant purpose for the formation of JMA-I.

JMA-II was funded by Ms. Jorgensen acting through her revocable trust and as executor of Colonel Jorgensen's estate. There is no credible evidence that Ms. Jorgensen wished to pool assets.

The estate argues that because Colonel and Ms. Jorgensen intended to give gifts to their children and grandchildren, doing so through the partnerships allowed for the pooling of those assets, achieving economies of scale resulting in lower operating costs, less need for administrative compliance, and better attention from service providers. However, there is little evidence to support this argument. The Jorgensens' investment adviser testified that if the gifts given to the children and grandchildren had been securities, rather than limited partnership interests, and they had held their own investment accounts, those accounts would have received less attention.

However, he further testified that family members would have received the same attention simply by linking the accounts together. We also doubt that giving securities to each of the children and grandchildren would have been less costly or complicated than creating two limited partnerships, each registered with the Commonwealth, requiring registered agents, annual reports to the Commonwealth, and the filing of annual Federal income tax returns and Schedules K-1.

### e.    Spendthrift Concerns

The estate argues that Colonel and Ms. Jorgensen transferred their assets to the partnerships because they intended to make gifts to their children and grandchildren and they had spendthrift concerns. Specifically, they were worried about divorces affecting family members, and they did not want to give assets to minors who might spend the windfall unwisely. They were also concerned because Gerald was a free spender who had "never saved a dime." Therefore, the estate argues they sought a management succession vehicle which would incorporate purposeful illiquidity and transfer restrictions.

Gerald may have been a spendthrift, but he was also a general partner in both partnerships. Although the general partners had to agree on distributions, he was in a position to exert influence. Jerry Lou, the other general partner, was frugal, and thus likely to resist large distributions. The

estate argues these opposing views were likely to curb Gerald's spending. Indeed since the creation of the partnerships, Gerald has become more conservative with his money. However, if Gerald's money-management habits had been a significant concern, it is unlikely Colonel Jorgensen would have decided to make him a general partner.

Gerald, despite being a general partner in both partnerships, believed until 1999 that the partnerships were like bank accounts and he could access money whenever he wanted. Yet he made no attempt to access the money until 1999, when he was told he could take a loan. He subsequently borrowed $125,000 to purchase a home. No payments were made on the loan for 2 years, and at that time, only interest was paid. The loan was finally repaid when Jerry Lou and her husband suggested that it be repaid to make the partnership "look very legit." At that point Gerald had received or was about to receive $286,637 which we presume was related to the settlement of his mother's estate, more than enough to satisfy the $125,000 loan. Gerald's ability to access funds in the form of a loan without making payment on the loan for 2 years suggests that curbing his spending was not a significant reason for the formation of the partnerships.

The estate also argues that the partnerships protected the family's assets from creditors. There is no evidence that Ms. Jorgensen or any other partner was likely to be liable in

contract or tort for any reason. The only colorable concern is that Gerald could have overextended himself financially, causing problems with creditors. However, this is a purely theoretical concern. Cf. <u>Kimbell v. United States</u>, 371 F.3d at 268 (acknowledging legitimate risk of personal liability where decedent transferred working interests in oil and gas properties into a family partnership and, absent partnership formation, family members as individuals would have faced exposure for environmental torts arising on those properties).

    f. <u>Providing for Children and Grandchildren Equally</u>

  The estate argues that Ms. Jorgensen's desire to provide for her children and grandchildren equally was a significant motivating factor in forming the partnerships. Ms. Jorgensen did provide for her children and grandchildren equally by giving them limited partnership interests. However, she could have provided for them equally well by giving securities directly. The only assistance the partnerships provided was to facilitate and simplify gift-giving equal to the annual gift tax exclusion, which is not a significant and legitimate nontax reason for transferring one's assets to a limited partnership.[11] See <u>Estate</u>

---

[11]This Court has held that providing for children equally was a significant and legitimate nontax reason for transferring assets to a family limited partnership. <u>Estate of Mirowski v. Commissioner</u>, T.C. Memo. 2008-74. However, that case involved the management of patents, patent licensing agreements, and

(continued...)

of <u>Bigelow v. Commissioner</u>, 503 F.3d at 972; <u>Estate of Bongard v. Commissioner</u>, 124 T.C. at 126-127.

> 2. <u>Factors Indicating the Transfers Were Not Bona Fide Sales</u>
>
> a. <u>Valuation Discounts</u>

The estate argues that tax savings could not have been the primary factor in forming the partnerships because discounts were not used in valuing Colonel and Ms. Jorgensen's gifts of partnership interests in 1995 through 1998. However, discounts were taken in valuing Colonel Jorgensen's estate after his death in 1996.

Around that same time Ms. Jorgensen's estate planner recommended that she transfer her remaining brokerage accounts to JMA-I. He wrote: "The reason for doing this is so that hopefully your limited partnership interest in JMA partnership will qualify for the 35% discount." Ms. Jorgensen did not transfer her remaining assets to JMA-I. Instead she created JMA-II and transferred her brokerage accounts to that partnership.

There is little contemporaneous documentary evidence with respect to the purpose for forming JMA-I. This is most likely because the purposes were discussed between Colonel Jorgensen and his attorney. Because JMA-II was formed with little direct input

---

[11](...continued)
related litigation which could not be readily divided into equal shares, as opposed to a portfolio of marketable securities which could. See <u>id.</u>

from Ms. Jorgensen, her attorney wrote her letters discussing the reasons for transferring her remaining brokerage assets to a limited partnership. Those letters show that reducing the value of Ms. Jorgensen's taxable estate, and thus tax savings, was the primary reason for the formation and funding of JMA-II.

The only documentary evidence showing a different reason for the formation and funding of the partnerships is a letter from Mr. Golden to Ms. Jorgensen in October 1998. It discusses her giving an additional $650,000 of limited partnership interests valued using significant discounts for lack of marketability and minority interests. It further discusses the potential for an Internal Revenue Service audit of the gift because JMA-II held only passive investments. It cites Estate of Schauerhamer v. Commissioner, T.C. Memo. 1997-242, and discusses the Commissioner's arguments and the reasons the Court determined that the taxpayer's family partnership should not be respected. The letter states that Ms. Jorgensen had several nontax reasons for creating JMA-II, including: The ability to transfer assets without disrupting the recipient's initiative, cost savings from the pooling of assets, simplification of gift-giving, protection against creditors, protection in the case of divorce, and the education of younger family members.[12] The letter was written

---

[12]We have previously observed that taxpayers often disguise tax-avoidance motives with a rote recitation of nontax purposes.
(continued...)

well after the formation and funding of the partnerships by an attorney preparing for potential litigation with respect to the gift. Thus, we give it little weight.

### b. Disregard of Partnership Formalities

Neither partnership maintained books and records other than a checkbook that went unreconciled and monthly brokerage statements. The partnerships' return preparer used the partnerships' brokerage statements to prepare the partnership returns. There were no formal meetings between the partners, and no minutes were ever kept.

Ms. Jorgensen and her children often failed to treat the partnerships as separate entities. Ms. Jorgensen used partnership assets to pay personal expenses, and she paid partnership expenses with her personal assets. For example, Ms. Jorgensen used partnership assets to give $78,500 of cash gifts to family members. The mingling of personal funds with partnership funds suggests that the transfer of property to a family limited partnership was not motivated by a legitimate and significant nontax reason. Estate of Reichardt v. Commissioner, 114 T.C. 144, 152 (2000).

Although Ms. Jorgensen was not financially dependent on distributions from the partnerships for her day-to-day expenses,

---

[12](...continued)
Estate of Hurford v. Commissioner, T.C. Memo. 2008-278; see Estate of Bongard v. Commissioner, 124 T.C. 95, 118 (2005).

she was dependent on the partnerships when her personal funds became insufficient to satisfy her gift-giving program. A taxpayer's financial dependence on distributions from the partnership suggests that the transfer of property to a family limited partnership was not motivated by a legitimate and significant nontax reason. Estate of Thompson v. Commissioner, T.C. Memo. 2002-246; Estate of Harper v. Commissioner, T.C. Memo. 2002-121.

JMA-II also made significant loans to its partners. Gerald borrowed $125,000 for the purchase of a home after he was told that he could not withdraw money outright. Although he borrowed the money in July 1999, he did not make any payments on the loan until July 2001. If Gerald had not repaid the loan, Jerry Lou believed she would have taken it out of his partnership interest, although doing so would have violated the partnership's requirement that distributions be pro rata.

### c. Whether the Transfers to JMA-I and JMA-II Were at Arm's Length

Where a taxpayer stands on both sides of a transaction, we have concluded that there is no arm's-length bargaining and thus the bona fide transfer exception does not apply. E.g., Estate of Strangi v. Commissioner, T.C. Memo. 2003-145; Estate of Harper v. Commissioner, supra. On the other hand, we have found an arm's-length bargain in the intrafamily context when the interests of the family members were sufficiently divergent. E.g., Stone v.

Commissioner, T.C. Memo. 2003-309.  Although intrafamily
transfers are permitted under section 2036(a), they are subject
to heightened scrutiny.  Estate of Bigelow v. Commissioner, 503
F.3d at 969; Kimbell v. United States, 371 F.3d at 263.

Colonel Jorgensen decided to form and fund JMA-I.  Although
he and Ms. Jorgensen contributed equal amounts to the
partnership, Ms. Jorgensen had no involvement in the decision or
the transfer.  Colonel Jorgensen's attorney believed that Colonel
Jorgensen represented Ms. Jorgensen during their meetings.
Neither Ms. Jorgensen nor any of their children or grandchildren
were consulted.  Under these circumstances, we conclude that the
transfer of assets to JMA-I was not at arm's length.

Ms. Jorgensen formed and funded JMA-II through her revocable
trust and in her role as executrix of her husband's estate.
Although she formed and funded JMA-II, the decision to do so was
largely made by her children in consultation with the family's
attorney.  Considering that Ms. Jorgensen stood on both sides of
the transaction, although in different roles, we conclude that
the transfer of assets to JMA-II was not at arm's length.

### 3.  Conclusion With Respect to Whether the Transactions Were a Bona Fide Sale

Taking into account the totality of the facts and
circumstances surrounding the formation and funding of the
partnerships, on the preponderance of the evidence we conclude
that Ms. Jorgensen did not have a legitimate and significant

nontax reason for transferring her assets to JMA-I and JMA-II, and therefore these were not bona fide sales. We find especially significant that the transactions were not at arm's length and that the partnerships held a largely untraded portfolio of marketable securities. See Estate of Thompson v. Commissioner, 382 F.3d at 380 (holding of an untraded portfolio of marketable securities weighs against finding of a nontax reason for transfer of portfolio to a family limited partnership). Although the estate recites a number of purported nontax reasons for the formation and funding of the partnerships, none of those alleged reasons are mentioned in contemporaneous documentation, and the estate has failed to establish that any of the reasons was significant and legitimate.

### 4. Whether the Transactions Were for Full and Adequate Consideration

The general test for deciding whether transfers to a partnership are made for adequate and full consideration is to measure the value received in the form of a partnership interest to see whether it is approximately equal to the property given up. Kimbell v. United States, 371 F.3d at 262; Estate of Bongard v. Commissioner, 124 T.C. at 118. Under Kimbell v. United States, supra at 266, we focus on three things:

> (1) whether the interests credited to each of the partners was proportionate to the fair market value of the assets each partner contributed to the partnership, (2) whether the assets contributed by each partner to the partnership

were properly credited to the respective capital accounts of the partners, and (3) whether on termination or dissolution of the partnership the partners were entitled to distributions from the partnership in amounts equal to their respective capital accounts. * * *

Respondent does not dispute that the transfers were made for full and adequate consideration.

C.   Whether Ms. Jorgensen Retained the Possession or Enjoyment of, or the Right to the Income From, the Property She Transferred to JMA-I and JMA-II

"An interest or right is treated as having been retained or reserved if at the time of the transfer there was an understanding, express or implied, that the interest or right would later be conferred." Sec. 20.2036-1(a), Estate Tax Regs. "The existence of formal legal structures which prevent de jure retention of benefits of the transferred property does not preclude an implicit retention of such benefits." Estate of Thompson v. Commissioner, 382 F.3d at 375; Estate of McNichol v. Commissioner, 265 F.2d 667, 671 (3d Cir. 1959), affg. 29 T.C. 1179 (1958); Estate of Bongard v. Commissioner, supra at 129.

The existence of an implied agreement is a question of fact that can be inferred from the circumstances surrounding a transfer of property and the subsequent use of the transferred property. Estate of Bongard v. Commissioner, supra at 129. We have found implied agreements where:  (1) The decedent used partnership assets to pay personal expenses, e.g., Estate of

Rosen v. Commissioner, T.C. Memo. 2006-115; (2) the decedent transferred nearly all of his assets to the partnership, e.g., Estate of Reichardt v. Commissioner, 114 T.C. 144 (2000); and (3) the decedent's relationship to the assets remained the same before and after the transfer, e.g., id.; Estate of Rosen v. Commissioner, supra.

Although Ms. Jorgensen retained sufficient assets outside the partnership for her day-to-day expenses, she lacked the funds to satisfy her desire to make cash gifts. Thus, Ms. Jorgensen used partnership assets to make significant cash gifts to her family members.

After Ms. Jorgensen's death, JMA-II made principal distributions of $179,000 and $32,000 which the estate used to pay transfer taxes, legal fees, and other estate obligations. The use of a significant portion of partnership assets to discharge obligations of a taxpayer's estate is evidence of a retained interest in the assets transferred to the partnership. See Estate of Rosen v. Commissioner, supra; Estate of Korby v. Commissioner, T.C. Memo. 2005-103; Estate of Thompson v. Commissioner, T.C. Memo. 2002-246. "[P]art of the 'possession or enjoyment' of one's assets is the assurance that they will be available to pay various debts and expenses upon one's death." Strangi v. Commissioner, 217 F.3d at 477.

The estate denies the existence of any agreement or understanding that Ms. Jorgensen would retain economic use and benefit of the assets transferred to the partnerships. However, the actual use of a substantial amount of partnership assets to pay Ms. Jorgensen's predeath and postdeath obligations undermines the claim. This is true regardless of whether the distributions were charged against her percentage ownership in the partnerships, and especially relevant considering that under the terms of the partnership agreements all distributions were to be pro rata. Under these circumstances, we conclude that there was an implied agreement at the time of the transfer of Ms. Jorgensen's assets to the partnerships that she would retain the economic benefits of the property even if the retained rights were not legally enforceable.

Respondent makes an alternative argument related to the legal effect of Gerald's and Jerry Lou's dual roles as general partners of the partnerships and cotrustees of Ms. Jorgensen's revocable trust. Ms. Jorgensen was the sole beneficiary of her revocable trust during her lifetime. Under the trust terms she had access to all trust income and corpus without restriction. Jerry Lou and Gerald, as cotrustees, had the duty to administer the trust solely for their mother's benefit. Ms. Jorgensen, through her revocable trust, owned significant interests in JMA-I and JMA-II, whose general partners were Gerald and Jerry Lou.

Gerald and Jerry Lou were under a fiduciary obligation to administer the trust assets, including the JMA-I and JMA-II partnership interests, solely for Ms. Jorgensen's benefit; and as general partners of JMA-I and JMA-II, they had express authority to administer the partnership assets at their discretion. Under these circumstances, we also conclude that Ms. Jorgensen retained the use, benefit, and enjoyment of the assets she transferred to the partnerships.

D. Conclusion With Respect to Whether the Values of the Assets Transferred to JMA-I and JMA-II Are Includable in the Value of the Gross Estate

We conclude that section 2036(a)(1) includes in the value of the gross estate the values of the assets Ms. Jorgensen transferred to JMA-I and JMA-II. Respondent argues in the alternative that section 2038 requires inclusion in the value of the gross estate of the values of the assets transferred into the partnerships. Because the asset values are included under section 2036(a)(1), we need not address respondent's alternative argument.[13]

---

[13]With respect to JMA-I, the parties stipulated that if we find that sec. 2036 applies, giving no consideration to Ms. Jorgensen's transfers of JMA-I interests made during her lifetime, the value of a 63.146-percent interest in JMA-I is includable in the value of her gross estate. The parties did not stipulate the includable percentage interest in JMA-II. However, we find that, giving no consideration to Ms. Jorgensen's transfers of JMA-II interests during her lifetime, the value of a 79.6947-percent interest in JMA-II is includable in the value of her gross estate.

(continued...)

## III. Equitable Recoupment

In 2006 Congress amended section 6214(b) to provide that we "may apply the doctrine of equitable recoupment to the same extent that it is available in civil tax cases before the district courts of the United States and the United States Court of Federal Claims."  Pension Protection Act of 2006, Pub. L. 109-280, sec. 858(a), 120 Stat. 1020; Menard, Inc. v. Commissioner,

---

[13](...continued)
The estate asserts, although only in objecting to one of respondent's proposed finding of facts, that if sec. 2036 applies, it applies only to the assets Ms. Jorgensen held on the date of her death plus those transfers she made within 3 years of her death which would be included in the gross estate under sec. 2035(a).  We assume the estate is referring to the possibility that Ms. Jorgensen sufficiently severed her ties to a portion of the retained assets so that sec. 2036 would not include those assets in her gross estate.

The estate's failure to argue the issue beyond a vague assertion within an objection to a proposed finding of fact leads us to conclude that the issue has been waived or abandoned.  See Rule 151(e)(3), (5); Bradley v. Commissioner, 100 T.C. 367, 370 (1993); Money v. Commissioner, 89 T.C. 46, 48 (1987); Stringer v. Commissioner, 84 T.C. 693, 706 (1985), affd. without published opinion 789 F.2d 917 (4th Cir. 1986).

Nevertheless, were the issue not waived or conceded, on the record before us we would not find that Ms. Jorgensen terminated a portion of her interest in the partnership assets.  The record indicates that Ms. Jorgensen retained the use, benefit, and enjoyment of the assets she transferred to the partnerships.  See supra pp. 36-39.

130 T.C. 54, 64 (2008).[14]  We recently described the doctrine as follows:

> The doctrine of equitable recoupment is a judicially created doctrine that, under certain circumstances, allows a litigant to avoid the bar of an expired statutory limitation period.  The doctrine prevents an inequitable windfall to a taxpayer or to the Government that would otherwise result from the inconsistent tax treatment of a single transaction, item, or event affecting the same taxpayer or a sufficiently related taxpayer.  Equitable recoupment operates as a defense that may be asserted by a taxpayer to reduce the Commissioner's timely claim of a deficiency, or by the Commissioner to reduce the taxpayer's timely claim for a refund.  When applied for the benefit of a taxpayer, the equitable recoupment doctrine allows a taxpayer to recoup the amount of a time-barred tax overpayment by allowing the overpayment to be applied as an offset against a deficiency if certain requirements are met.

> As a general rule, the party claiming the benefit of an equitable recoupment defense must establish that it applies.  In order to establish that equitable recoupment applies, a party must prove the following elements: (1) The overpayment or deficiency for which recoupment is sought by way of offset is barred by an expired period of limitation; (2) the time-barred overpayment or deficiency arose out of the same transaction, item, or taxable event as the overpayment or deficiency before the Court; (3) the transaction, item, or taxable event has been inconsistently subjected to two taxes; and (4) if the transaction, item, or taxable event involves two or more taxpayers, there is sufficient identity of interest between the taxpayers subject to the two taxes that the taxpayers should be treated as one.

---

[14]Before the amendment to sec. 6214(b), the Courts of Appeals that considered whether we may entertain an equitable recoupment claim split on the question.  Compare Estate of Mueller v. Commissioner, 153 F.3d 302 (6th Cir. 1998), affg. on other grounds 107 T.C. 189 (1996), with Estate of Branson v. Commissioner, 264 F.3d 904 (9th Cir. 2001), affg. 113 T.C. 6, 15 (1999).

Menard, Inc. v. Commissioner, supra at 62-63 (citations omitted).

The estate contends that it is entitled to equitable recoupment for income taxes paid by Ms. Jorgensen's children and grandchildren (JMA-I and JMA-II partners) on sales of stock that occurred in 2003 through 2006 the values of which we have held are properly included in the value of Ms. Jorgensen's gross estate under section 2036.

A.  Whether a Refund Is Barred by an Expired Period of Limitations

The children and grandchildren filed their 2003 income tax returns on or about April 15, 2004.  They filed protective claims for refund for the years 2003 through 2006.  Respondent rejected the 2003 claims as untimely.  The claims for 2004 through 2006 have not been ruled on, but they appear timely.[15]  Therefore, the first element of the equitable recoupment claim is met only with respect to income taxes overpaid in 2003.

B.  Whether the Overpayment Arose out of a Single Transaction, Item, or Event

A claim of equitable recoupment will lie only where the Government has taxed a single transaction, item, or taxable event under two inconsistent theories.  Estate of Branson v.

_____

[15]The parties stipulated that the 2003 claims for refund were submitted between Apr. 6 and 9, 2008.  We presume that the 2004 claims were submitted at the same time.  Claims for refund with respect to the 2004 tax year would have to have been filed on or before Apr. 15, 2008, assuming the returns were timely filed.  See secs. 6511(a), 6513(a).

Commissioner, 113 T.C. 6, 15 (1999), affd. 264 F.3d 904 (9th Cir.
2001). In Estate of Branson, the decedent's estate included
stock in two closely held corporations. To pay applicable estate
taxes, the estate sold a portion of the stock. The stock was
sold for considerably more than its value reported on the estate
tax return. Under section 1014(a)(1),[16] the value of the stock
as declared on the estate tax return was used as its basis for
determining gain from the sale. The estate did not pay the tax
on the sale but distributed the gain to the estate's residuary
beneficiary, who paid the tax due. The Commissioner determined a
deficiency in estate tax on the ground that the closely held
corporation stock was worth substantially more than declared. In
Estate of Branson v. Commissioner, T.C. Memo. 1999-231, we agreed
with the Commissioner. Our revaluation of the stock resulted in
an estate tax deficiency. Since pursuant to section 1014(a) the
same valuation was used to determine the residuary beneficiary's
gain on the sale of the stock, it followed that the residuary
beneficiary had overpaid her income tax. Estate of Branson v.
Commissioner, 264 F.3d at 907.

We have held that the values of the assets Ms. Jorgensen
transferred to JMA-I and JMA-II are included in the value of her

---

[16]Sec. 1014 generally provides a basis for property acquired
from a decedent that is equal to the value placed upon the
property for purposes of the Federal estate tax. See Estate of
Branson v. Commissioner, 113 T.C. at 34-35; sec. 1.1014-1(a),
Income Tax Regs.

gross estate. JMA-I and JMA-II sold some of those assets during 2003, and the partners paid capital gains tax on the proceeds. The estate argues that the single item in question is the stock contributed by Ms. Jorgensen to the partnerships and sold by the partnerships during 2003. In Estate of Branson, closely held corporation stock included in the decedent's gross estate and then sold by the estate satisfied the single item requirement. In this case, stock included in Ms. Jorgensen's gross estate and sold by the partnerships in 2003 is a single item. Thus, the second element of the equitable recoupment claim is met.

C.   Whether the Single Item Would Be Subjected to Two Taxes Inconsistently

The value of stock contributed by Ms. Jorgensen and sold by the partnerships in 2003 was included in both the value of Ms. Jorgensen's gross estate and her children's and grandchildren's taxable income (to the extent of the gain resulting from the stock sale). The inclusion of the item in the gross estate results in an increase in the stock's basis in the hands of the partnership pursuant to section 1014(a). Increased basis in the assets results in a decrease of the gain and resulting income tax on the sale of those assets. However, the partners' 2003 claims for income tax refunds are barred under section 6511(a). Therefore, the estate tax and income tax have been imposed on the same item inconsistently. See Estate of Branson v. Commissioner, 264 F.3d at 917 ("the 'single transaction' prerequisite to

equitable recoupment is satisfied where the same item * * * is taxed as both the corpus of the estate and income to the beneficiary").

D.    Sufficient Identity of Interest

The final element of an equitable recoupment claim is that the taxpayers involved (the estate and the JMA-I and JMA-II partners) have a sufficient identity of interest so that they should be treated as a single taxpayer in equity.  Stone v. White, 301 U.S. 532, 537-538 (1937); Parker v. United States, 110 F.3d 678, 683 (9th Cir. 1997).

Both Estate of Branson and this case involve the judicial determination of an estate tax deficiency resulting from the increased values of securities held by the decedent on the date of death.  Pursuant to section 1014(a)(1), the value of the securities used in calculating the estate's Federal estate tax as determined by this Court became the basis of those assets after Ms. Jorgensen's death.  During 2003 JMA-I and JMA-II sold assets Ms. Jorgensen had contributed and calculated the gain on sale with respect to the bases of the assets in Ms. Jorgensen's hands at the time they were contributed.  As a result of our determination, the bases of the assets were increased and it follows that JMA-I's and JMA-II's partners overpaid their income tax.

Respondent argues that if we determine the estate is entitled to equitable recoupment, we should limit the recoupment to the income taxes paid by Jerry Lou and Gerald, who, pursuant to Ms. Jorgensen's will and revocable trust, are ultimately responsible for the estate tax liability. The grandchildren are not liable for the estate tax deficiency. In Estate of Branson, the residuary beneficiary, like Gerald and Jerry Lou, was responsible for the estate tax liability and was the one who overpaid income tax, thus entitling the estate to equitable recoupment. However, the relevant caselaw does not indicate that the taxpayer who overpaid tax must be the one responsible for the related deficiency for equitable recoupment to apply.

We have found that there was an implied agreement that Ms. Jorgensen would retain control of the assets she contributed to the partnerships even though she purported to give partnership interests to her children and grandchildren. The partnerships paid her expenses including her Federal and California estate tax liabilities (as calculated on the estate tax returns). The assets were included in her gross estate as if they had not been transferred to the partnerships. The goal of Ms. Jorgensen's gift program was to reduce the value of her estate; i.e., a testamentary goal. Because of the program, the objects of her bounty, her children and grandchildren, paid income taxes on assets that were later determined to be properly included in

valuing her gross estate, thus subjecting those assets to improper double taxation. Under these circumstances, we find that there is sufficient identity of interest between Ms. Jorgensen's estate and her children and grandchildren.

It would be inequitable for the assets to be included in the value of Ms. Jorgensen's gross estate under section 2036 on the one hand, and on the other hand for the estate not to recoup the income taxes her children and grandchildren overpaid on their sale of those very same assets but are unable to recover in a refund suit. Accordingly, the estate is entitled to equitable recoupment of the 2003 income taxes overpaid by Ms. Jorgensen's children and grandchildren as a result of our determination that the values of the assets Ms. Jorgensen transferred to the partnerships are included in the value of her gross estate under section 2036.

To reflect the foregoing and the concessions of the parties,

An appropriate order will be issued denying petitioner's motions to shift the burden of proof, and decision will be entered under Rule 155.